**In re LADY MADONNA INDUSTRIES, INC., Lady Madonna Management, Inc., and Lady Madonna Manufacturing, Co., Inc., Debtors.**

**The ROYAL BANK AND TRUST COMPANY, Plaintiff–Appellant,**

v.

**John S. PEREIRA, as Chapter 7 Trustee, Defendant–Appellee.**

No. 87 Civ. 8226(JMC).

Bankruptcy Nos. 84 B 10058(HCB)–84 B 10060(HCB).

Adv. No. 86–5428–A.

United States District Court, S.D. New York.

May 2, 1989.

See also, D.C., 76 B.R. 281.

Robert L. Howard, New York City, for plaintiff-appellant.

Otterbourg, Steindler, Houston & Rosen, New York City, for defendant-appellee.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Bankruptcy Judge Howard C. Buschman's Decision and Order of October 6, 1987, granting appellee's motion to dismiss for failure to state a claim and denying appellant's motion for partial summary judgment, is affirmed. 28 U.S.C. § 158(a).

## BACKGROUND

The facts underlying this appeal from a decision and order of Bankruptcy Judge Howard C. Buschman are not in dispute. The debtors, Lady Madonna Industries, Inc. and its two wholly owned subsidiaries, Lady Madonna Management Corp. and

Lady Madonna Manufacturing Co., Inc. [collectively the "debtors"], were engaged in the business of manufacturing and selling maternity wear and baby clothing to their franchisees. The maternity wear and baby clothing sold by the debtors' bore the trademarks and trade names "Lady Madonna" or "Baby Madonna" [collectively the "trademarks"].

On January 12, 1984 the debtors filed petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* The cases were subsequently converted to Chapter 7 and John S. Pereira [the "Trustee"] was appointed interim trustee. Thereafter, Pereira was appointed permanent trustee.

On November 21, 1985, the Bankruptcy Court entered an order approving the Trustee's sale of the trademarks free and clear of any liens, which liens attach to the proceeds. The Trustee received $325,000 for the trademarks and is holding that amount in an interest bearing account(s).

Thereafter, plaintiff The Royal Bank and Trust Co. [the "Bank"] instituted adversary proceedings against the Trustee. The Bank claimed that in a document dated December 23, 1980, and entitled "Security Agreement," the debtors granted it a security interest in the trademarks. The Security Agreement describes the collateral as "all of our accounts receivable, contract rights, equipment, and farm products, and any instruments, documents, chattel paper and general intangibles relating thereto or arising therefrom, whether secured or unsecured or now existing or hereafter created or acquired by us and all cash and noncash proceeds and products thereof." Affidavit of Rosaleen T. Burbage, Exh. A, ¶ 1, 87 Civ. 8226 (JMC) (S.D.N.Y. Dec. 4, 1987) ["Burbage Affidavit"].

In nearly identical documents dated February 11, 1982, and also entitled "Security Agreement," similar security interests were granted to the Bank.[1] In addition, each of the Security Agreements contains a non-merger clause which provides that

> [t]his agreement and the security interest hereunder are in addition to and not in substitution for any other security interest now or hereafter held by you and shall not operate as a merger of any contract debt or suspend the fulfillment of or affect your rights, remedies or powers in respect of any obligation or other security interest held by you for the fulfillment thereof. The remedies herein provided are cumulative and are not exclusive of any remedy provided by law.

Burbage Affidavit at Exh. A, ¶ 10.

Financing statements were filed in the proper locations on December 31, 1980 and February 2, 1981, which describe the collateral as "[a]ll accounts receivable, contract rights of debtor now existing or owned or hereafter arising or acquired, together with all instruments, documents, chattel papers and general intangibles relating to or arising from the foregoing collateral and all cash and non-cash proceeds and products thereof."[2] Burbage Affidavit at Exh. B.

In its complaint the Bank alleged that the Security Agreements granted it a security interest in the debtors' trademarks and requested judgment declaring that it had a valid lien and ordering the Trustee to pay over the proceeds derived from the sale.

Thereafter, the Trustee moved to dismiss the complaint for failure to state a cause of action. The Bank cross-moved for partial summary judgment. On October 6, 1987, the Bankruptcy Court issued a decision and order granting the Trustee's motion to dismiss for failure to state a claim and denying the Bank's motion for partial summary judgment. The Bankruptcy Court found

---

**1.** In the December 23, 1980 Security Agreement, the word "inventory" between the words "equipment" and "and" is crossed out. In the February 11, 1982 Security Agreements, the word "and" between the words "equipment" and "farm products" is crossed out as well. Neither of the parties contends that this is a significant difference. Furthermore, one of the February 11, 1982 documents is signed by "Lady Madon-

na Management Inc." as opposed to "Lady Madonna Management Corp." Again, neither party argues that this difference is of any consequence.

**2.** It is undisputed that the Bank's security interests were perfected by the requisite filings.

that the description of the collateral in the Security Agreements could not be interpreted to include the debtors' trademarks under the general connotation of general intangibles related to accounts receivable. In addition, the Bankruptcy Court found that the Security Agreement documents were not ambiguous and, therefore, parol evidence could not be admitted. Thereafter, the Bank instituted the present appeal.

## DISCUSSION

### I. *Standard of Review*

Pursuant to 28 U.S.C. § 158(a), the district court has "jurisdiction to hear appeals from final judgments, orders, and decrees" of the bankruptcy court. Bankruptcy Rule 8013 provides that the district court "may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings." Although a bankruptcy court's findings of fact should not be disturbed unless "clearly erroneous," its conclusions of law may be reviewed de novo. *See In re New England Fish Co.*, 749 F.2d 1277, 1280 (9th Cir.1984); *In re Dill*, 731 F.2d 629, 631 (9th Cir.1984); *In re Multiponics, Inc.*, 622 F.2d 709, 713 (5th Cir.1980) (a bankruptcy court's conclusions of law are "freely reviewable").

Because this is an appeal from a decision granting a motion to dismiss the complaint for failure to state a claim and denying a motion for partial summary judgment, purely legal considerations are involved. Thus, the Court's review must be de novo.

■ Generally, a complaint may be dismissed only if its claims are unquestionably insufficient to entitle plaintiff to relief regardless of the supporting facts that may be proved at trial. *See Duncan v. AT & T Communications, Inc.*, 668 F.Supp. 232, 234 (S.D.N.Y.1987) (citing cases). Thus, all well pleaded factual allegations are assumed true and are viewed in a light most favorable to plaintiff. *See Duncan*, 668 F.Supp. at 234 (citing *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). Accordingly, doubt as to a party's

ability to prove his case, no matter how unlikely it seems he will be able to prove it, is no reason for dismissing his pleadings for failure to state a claim upon which relief may be granted. *See Carnivale Bag Co. v. Slide–Rite Mfg. Corp.*, 395 F.Supp. 287, 291 (S.D.N.Y.1975).

### II. *The Security Agreements*

■ General intangibles are defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." N.Y.U.C.C. § 9–106. It is undisputed by the parties that trademarks and trade names are considered general intangibles. *See* Decision and Order, p. 10 n. 3, 84 B. 10058–60, 86–5428A (S.D.N.Y. Oct. 6, 1987) ["Decision and Order"]; *see also In re Emergency Beacon Corp.*, 23 U.C.C.Rep. 766 (Bankr.S.D.N.Y.1977); *In re Magnum Opus Elec., Ltd.*, 19 U.C.C.Rep. 242 (S.D.N.Y.1976). The Security Agreements in the instant action, however, grant a security interest in only those general intangibles *related to* accounts receivable and contract rights. The issue on appeal, therefore, is whether the trademarks and trade names "Lady Madonna" and "Baby Madonna" relate to the debtors' accounts receivable and contract rights.

It is axiomatic that a security agreement is not enforceable against the debtor or third parties unless "the collateral is in possession of the secured party ..., or ... the security agreement contains a description of the collateral." N.Y.U.C.C. § 9–203(1)(a) (emphasis added). The description need not be exact or detailed but, it must "do the job assigned to it—... make possible the identification of the thing described." N.Y.U.C.C. § 9–110 Official Comment; *see In re Sarex Corp.*, 509 F.2d 689 (2d Cir.1975); *United States v. First Nat'l Bank*, 470 F.2d 944 (8th Cir. 1973). The signed writing requirement is in the nature of a statute of frauds and serves the evidentiary function of minimizing "disputes as to precisely which items of property are covered by a secured interest." *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir.1973) (citations omitted).

"Where a security agreement clearly grants a specific, unambiguous security interest, parol evidence cannot enlarge the security interest beyond that stated in the security agreement." *In re Martin Grinding & Machine Works, Inc.*, 42 B.R. 888, 891 (Bankr.N.D.Ill.1984) (citing cases); *see Mitchell v. Shepherd Mall State Bank*, 458 F.2d 700 (10th Cir.1972); *In re Swearingen*, 27 B.R. 379 (Bankr.D.Kan.1983).

An ambiguous claim is one that is susceptible to two reasonable interpretations. *See Diodato v. Eastchester Development Corp.*, 111 A.D.2d 303, 304, 489 N.Y.S.2d 293, 294 (2d Dep't 1985). Where the court finds as a matter of law that the language is unambiguous, extrinsic evidence is not admissible. *See Dannhardt v. Donnelly*, 604 F.Supp. 796, 803 (E.D.N.Y.1985); *Carvel Corp. v. Rait*, 117 A.D.2d 485, 487, 503 N.Y.S.2d 406, 409 (2d Dep't 1986) (per curiam). However, where some ambiguity exists, it is permissible for the court to resort to extrinsic evidence to ascertain the meaning of the contract. *See* 22 N.Y. Jur.2d, *Contracts*, 188, 189, at 22–25 (1982).

In the instant action, the Bank argues that the trademarks are related to the debtors' accounts receivable and contract rights "since all of the debtors' accounts receivable arose from the sale of 'Lady Madonna' and 'Baby Madonna' branded garments to the debtors' franchisees, who traded under the name 'Lady Madonna' and 'Baby Madonna.'" Appellant's Brief, p. 15, 87 Civ. 8226 (JMC) (S.D.N.Y. Dec. 4, 1987) ["Appellant's Brief"]. The Bank argues further that "[t]he price of the garments, and therefore the amount of the accounts receivable and contract rights that the debtors were able to amass by contracting to make and making such sales, depended on the value of these names and good will established by the franchisees who traded under such names." *Id.* Thus, the Bank contends that the "description of general intangibles related to the debtors' accounts receivable and contract rights reasonably identifies the 'Lady Madonna' and 'Baby Madonna' trademarks and tradenames in that such description makes possible their identification." *Id.*

The Bank correctly points out that the U.C.C. does not provide a definition of the term "related thereto" but, states that a general dictionary definition and a legal definition within the factual context of this case will support its position. The Bank observes that the American Heritage Dictionary defines "relate" to mean "to have connection, relation or reference." *The American Heritage Dictionary* 1043 (2d ed. 1982). The Bank further observes that Black's Law Dictionary defines "relate" to mean "to stand in some relation, to have bearing or concern, to pertain; refer; to bring into association with or connection with; with 'to'." *Black's Law Dictionary* 1158 (5th ed. 1979). The Bank argues that under these definitions

the general intangible trademarks and tradenames "Lady Madonna" and "Baby Madonna" relate to the debtors' accounts receivable and contract rights since they have a connection with one another (the accounts receivable and contract rights arise from the contracting to make and making of sales of "Lady Madonna" and "Baby Madonna" branded garments), stand in some relation to one another (sales of branded garments were made only to franchisees who traded under the "Lady Madonna" and "Baby Madonna" names), and have bearing on one another (the price and therefore the amount of the accounts receivable depends on the value of the names and the good will established by the ·franchisee-account debtors who traded under such names).

Appellant's Brief at p. 17. The Bankruptcy Court, however, found that

[i]n the sense applicable here, as opposed to narration or kinship, the term "related" is defined as "[h]aving relationship, as to or with something expressed or implied or with each other; connected by reason of an established or discoverable relationship." *Websters International Dictionary of the English Language* (2d Ed. G. & C. Merriam Co. 1961). In turn, "relation" is defined in this sense as "what is apprehended as appertaining to a being or quality, in considering it in its bearing on something else." *Ibid.* . . .

Thus, the debtor's trademarks and tradenames are not related to their accounts receivable for they have no feature bearing on each other except when considered as parts of the total of all the debtor's assets. But here both the security agreements and the financing statements eschew claiming all assets as collateral.

Decision and Order at p. 6. The Bankruptcy Court, therefore, in a thorough and well reasoned opinion, found that

[the Bank's] argument ... is nothing more than a statement that the accounts receivable might arise in part from the trademarks and tradenames, as well as the debtors' inventory, franchise contracts, manufacturing contracts and skills of their employees while the collateral description speaks of general intangibles arising from accounts, not the other way around. Furthermore, that argument is nothing more than an assertion that the clause be interpreted to bring in all assets that somehow are used in the making of goods that are sold on credit. Such a construction would, however, effectively leave the term without meaning.

Such a construction would, moreover, define the term to include all that might somehow be connected to accounts receivable without any notion of their being "connected by [a] ... relation" and thus by "what is apprehended as appertaining to a being or quality.... in its hearing [sic] or something else" as the definition requires. A hypothetical prospective creditor would clearly envision such. There is simply nothing that would be apprehended by a prospective creditor as appertaining to trademarks and tradenames on the one hand and accounts receivable on the other. Consequently, the description of collateral cannot reasonably be interpreted from the four corners of the security agreement to embrace the debtors' trademarks and tradenames under the connotation of general intangibles related to accounts receivable.

Decision and Order at p. 7. After reviewing the Security Agreements, 13(h) state-

ments, affidavits and memorandum of law and considering the issue de novo, the Court concludes that the bankruptcy court properly determined that the trademarks and trade names "Lady Madonna" and "Baby Madonna" do not "relate" to the debtors' accounts receivable and contract rights.

Because the Court finds that the Security Agreements unambiguously failed to include the trademarks as collateral, extrinsic evidence as to the parties' intent is inadmissible. *See In re Schmaling,* 783 F.2d 680, 682 (7th Cir.1986) (citations omitted) ("security interest granted by a debtor to a creditor is limited strictly to the property or collateral described in the security agreement"); *Mitchell,* 458 F.2d at 704 (parol evidence of parties' intent inadmissible where security agreement unambiguous); *Martin Grinding,* 42 B.R. at 892 (unambiguous security agreement defined extent of security interest and collateral covered can not be extended by looking to other documents or evidence); N.Y.U.C.C. § 9–201 ("a security agreement is effective according to its terms between the parties, ...").

## III. *Commitment Letter Documents*

Prior to the execution of the Security Agreements and financing statements, the Bank and the debtors executed a commitment letter which described the collateral as "U.C.C. Filing on all assets of—Lady Madonna Industries, Inc., Lady Madonna Management Corp., Lady Madonna Manufacturing Co. Inc." Burbage Affidavit at Exh. C.

After executing the commitment letter but, also prior to the execution of the Security Agreements and financing statements, the Bank and the debtors executed an amendment to the commitment letter which described the collateral as "1. U.C.C. filing on all assets, *excluding* inventory of Lady Madonna Industries Inc., Lady Madonna Management Corp. and Lady Madonna Manufacturing Co. Inc. [and] 2. A negative pledge regarding inventory." *Id.* (emphasis in original). The Bank argues that these documents are to be combined with

the Security Agreement documents to form the operative security agreement.

■ The "Composite Document" theory of security agreements permits a finding of a security agreement through various loan documents. *See generally In re Bollinger*, 614 F.2d 924 (3d Cir.1980); *In re Amex–Protein Development Corp.*, 504 F.2d 1056 (9th Cir.1974); *Numeric*, 485 F.2d at 1328; *Martin Grinding*, 42 B.R. at 888; *In re Wambach*, 343 F.Supp. 73 (N.D.Ill.1972), *aff'd*, 484 F.2d 572 (7th Cir.1973). In the aforementioned cases, however, no single document qualified as a security agreement. The courts, therefore, had to consider various loan documents collectively to determine the extent of the agreement between the parties.

"[J]udicial crafting of a security agreement is not appropriate where the parties have bargained-for and executed a valid and complete security agreement." *In re H & I Pipe and Supply Co.*, 44 B.R. 949, 951 (Bankr.M.D.Tenn.1984). Moreover,

[c]ases considering the extent of a security interest where there is a conflict in the collateral descriptions in the loan documents have generally held that where there is a security agreement complete on its face, the courts will not refer to other documents to expand the scope of the security interest unless the security agreement itself refers to those other documents.

*Id.* at 950 (citing cases).

■ In the instant action, that the Bank and the debtors have a security agreement which does not refer to the commitment letter documents is not questioned. "There is no need to look at other documents where the security agreement is facially complete and does not refer to other documents." *In re Marta Cooperative, Inc.*, 74 Misc.2d 612, 344 N.Y.S.2d 676, 678, 12 U.C.C.Rep. 955, 958 (N.Y.Co.Ct.1973). Thus, the commitment letters can not be used to form the operative Security Agreement.

■ In the alternative, the Bank argues that the non-merger clause in each of the security agreements preserved prior security agreements and that the commitment letter documents constituted such prior security agreements. The Bank relies principally on the case of *In re Owensboro Canning Co.*, 82 B.R. 450 (Bankr.W.D.Ky. 1988), to support this proposition. That case is not controlling. In *Owensboro* the district court affirmed the finding of the bankruptcy court that plaintiff Continental Can Company had a valid and enforceable security interest in the accounts receivable, inventory and raw materials of the debtor, Owensboro Canning Co. The bankruptcy court based its finding that the parties intended to create a security interest on the existence of an executed letter of intent. Unlike the instant case, however, in *Owensboro* the parties had been unable to agree on the wording of a security agreement, and, hence, a security agreement as such was never signed.

In addition, and more importantly, at the time the letter of intent was signed, an executed financing statement was filed with the County Clerk's Office. In the instant action, the Bank does not assert that a prospective creditor, put on notice by the filed financing statements, would have turned to the commitment letter documents and not the Security Agreements to determine the extent of the secured interest. The Court finds, therefore, that the commitment letter and amendment to the commitment letter do not qualify as an enforceable security agreement.

## IV. *Financing Statements*

The Bank also argues that the financing statements perfected its security interest in the trademarks as they put third parties on notice that it may have a security interest therein which could have been determined upon reasonable inquiry. However:

The question of misdescription of collateral in the financing statement is distinct from the question of misdescription in the security agreement. The two documents serve different functions: The security agreement establishes rights between the initial creditor and the debtor, and the financing statement establishes rights between the initial creditor and

those who file subsequently.... Descriptions in the security agreement are subject to a higher, but still lenient, standard.

*In re Tri–State Equip., Inc.,* 792 F.2d 967, 972 n. 6 (10th Cir.1986) (citations omitted).

Unlike a financing statement (U.C.C. § 9–402) which is designed merely to put creditors on notice that further inquiry is prudent, ... the security agreement embodies the intentions of the parties. It is the primary source to which a creditor's or potential creditor's inquiry is directed and must be reasonably specific.

*In re Laminated Veneers, Co.,* 471 F.2d 1124, 1125 (2d Cir.1973) (citations omitted). "Absent language which would constitute the debtor's grant of a security interest, a financing statement cannot serve as a security agreement." *Mitchell,* 458 F.2d at 704 (citations omitted). In the instant action, the financing statements do not contain granting language. On the contrary, they contain nothing more than was necessary to fulfill the purposes of notice filing. "Under these circumstances, [they] cannot have the effect of enlarging the security agreement so as to create a security interest in collateral not described therein." *Id.* Thus, the question of whether the financing statements put third-party creditors on notice is irrelevant to the issue of whether the Security Agreements included the trademarks as collateral.

## CONCLUSION

For all of the foregoing reasons, Bankruptcy Judge Howard C. Buschman's Decision and Order of October 6, 1987 granting appellee's motion to dismiss for failure to state a cause of action and denying appellant's motion for partial summary judgment, is affirmed. 28 U.S.C. § 158(a).

SO ORDERED.