**In re ATLANTIC COMPUTER SYSTEMS, INC., et al., Debtors.**

**COMMERCIAL MARKETING, INC., Appellant,**

v.

**ATLANTIC COMPUTER SYSTEMS INC., Appellee.**

No. 92 Civ. 6108 (SWK).

United States District Court, S.D. New York.

May 3, 1993.

## MEMORANDUM OPINION
## AND ORDER

KRAM, District Judge.

Appellant/Claimant Commercial Marketing, Inc. ("CMI") appeals from a Memorandum Endorsed decision of the United States Bankruptcy Court for the Southern District of New York (Lifland, C.J.) (the "Bankruptcy Court"), dated June 24, 1992, in which the Bankruptcy Court granted Appellee/Debtor Atlantic Computer Systems Inc.'s ("ACS") motion for summary judgment and disallowed CMI's claim in its entirety.[1]

## BACKGROUND

The following facts are undisputed by the parties. In early 1988, ACS's British parent, Atlantic Computers, Plc, began examining CMI's subsidiary, Systems Marketing, Inc. ("SMI"), an IBM computer leasing company, for a proposed purchase of its stock or its assets. A letter of interest was issued in July 1988, a letter of intent was presented to CMI in October 1988, and a further letter of intent dated March 22, 1989, was offered by ACS and accepted by CMI on March 31, 1989. Each of these letters provided that they were either a letter of interest or a letter of intent, and each contained the language "Subject to Contract." Each letter of intent also contained a "walk-away" provision allowing either party the option to walk away from the deal without liability in the event negotiations were unsuccessful.

Sometime around June 13, 1989, the structure of the acquisition was changed from a purchase of the SMI stock to a portfolio purchase of assets. Thereafter, on June 28, 1989, CMI and ACS entered into an Agreement[2] (the "June Agreement" or the "June 28, 1989 Agreement") whereby ACS was to purchase certain assets and assume certain liabilities of CMI's

Fitzgerald, Schorr, Barmettler and Brennan, Omaha, NE by William Jay Riley, Thomas L. Saladino; Luskin & Stern, New York City by Nathan M. Eisler, Jeanne M. Murphy, for appellant/claimant.

Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City by Norris D. Wolff, Monica L. Kaiser, for appellee/debtor.

1. That opinion is reported as *In re Atlantic Computer Sys. Inc.*, 142 B.R. 659 (Bkrtcy.S.D.N.Y. 1992).

2. Despite the fact that the June 28, 1989 Agreement has the word *"AGREEMENT"* printed clearly on the top of the first page, ACS refers to the June 28, 1989 Agreement as the most recent Letter of Intent. The Court disagrees with this characterization.

subsidiary, SMI. That Agreement stated in part:

> [B]oth parties ... subject only to the conditions stated herein, hereby agree as follows:
>
> 1. ACS will purchase certain assets of SMI, rather than purchasing the SMI stock (Common Shares), and will treat the transaction as a portfolio purchase.
>
> 2. ACS and CMI will cooperate in every regard to execute and deliver, or cause SMI to execute and deliver on or before June 30, 1989, the Portfolio Purchase Agreement pursuant to which title to such assets shall not pass to ACS until expiration of the Hart–Scott–Rodino Act (HSR Act) waiting period.
>
> \* \* \* \* \* \*
>
> This Agreement is *subject to* the following conditions (emphasis in original):
>
> 1. Final pricing subject to asset adjustments presented by the auditors.
>
> 2. Final definitive agreement approved by Boards of Directors of ACI [3] and SMI.

*See* Agreement, attached to CMI's Proof of Claim and designated by CMI as D–1 for the record on appeal.

Although there is some dispute as to precisely what else transpired between ACS and CMI around the time of the June Agreement, it is clear that: (1) from June 26, 1989 through June 30, 1989, work was done on a final Portfolio Purchase Agreement; (2) employment agreements following standard ACS forms were sent from ACS to SMI and were signed by SMI management personnel; (3) ACS requested short-term financing from Commercial Federal Savings and Loan Association, the parent of SMI and CMI; (4) Commercial Federal Corporation, SMI's ultimate parent, filed its Hart–Scott–Rodino notification with the Federal Trade Commission and the Justice Department on July 10, 1989; (5) ACS's Vice President of Acquisitions visited SMI in Phoenix, Arizona and addressed a meeting of SMI employees; (6) in early July, a matter arose regarding a lawsuit between SMI and its former owner, Robert Russell, whereby Commercial Federal Sav-

ings and Loan, CMI and SMI agreed to provide ACS with full indemnification regarding the Russell litigation; and (7) an indemnification agreement was included in the Portfolio Purchase Agreement.

On June 29, 1989, a regular meeting of the Board of Directors of ACS was held. At that meeting, an SMI purchase committee with the mandate to recommend the approval or disapproval of the purchase of SMI assets to the full Board was created.

On July 13, 1989, a special meeting of ACI's Board of Directors was held. It was called specifically to review the proposed transaction between its wholly owned subsidiary, ACS, and SMI. At that meeting, it was decided that the SMI asset purchase was not in ACS's best interests. Thus, a motion was made, seconded and unanimously adopted formally rejecting the SMI transaction.

ACS's Board of Directors also held a special meeting on July 13, 1989. At this meeting, the Board unanimously voted to terminate discussions respecting the proposed asset purchase as it was not in the best interest of ACS and rejected the SMI purchase.

CMI and SMI were informed of the Boards' rejections by letter dated July 13, 1989. The letter, written by Philip E. Hold, the President of ACS at the time, states in relevant part:

> This letter is to formally advise you that Atlantic Computer Systems Inc. (Atlantic) has terminated its interest in purchasing either the share capital or certain assets of Systems Marketing, Inc. (SMI).
>
> The Board of Directors has now rejected the transaction, which of itself is fully dispositive of further consideration of the proposed asset purchase most recently under consideration. In addition, there were numerous material unresolved issues, including, but not limited to, the responsibility for leases previously discounted on a recourse basis, the inferior credit quality of unfunded leases

---

**3.** ACS is a wholly owned subsidiary of Atlantic Computers Inc. ("ACI").

and the Russell litigation notice to Atlantic.

*See* Letter from Philip E. Hold to Mike Minor, President of CMI, and Bill Bresnahan, President of SMI, dated July 13, 1989, attached as Exhibit "J" to Affidavit of John Sager, sworn to on March 3, 1992.

CMI filed suit against ACS in the United States District Court for the District of Arizona on May 18, 1990 based upon ACS's alleged breach of the contract to purchase assets and assume liabilities of CMI's subsidiary, SMI. This suit was pending and in the discovery stage when, on July 5, 1990, ACS filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. On May 3, 1991, CMI filed a $14,578,891 (estimated) claim in the above-captioned bankruptcy proceeding.

Thereafter, ACS filed an Objection and Notice of Motion to Disallow [CMI's] Claim and an Affidavit in Support of Objection and Motion to Disallow Claim. A hearing on the Motion to Disallow was held in the Bankruptcy Court on June 24, 1992, and was treated as a Motion for Summary Judgment. On the same day, the Bankruptcy Court issued a Memorandum Endorsed opinion granting ACS's motion for summary judgment and disallowing CMI's claim. Specifically, the Bankruptcy Court found that the parties did not intend the June 28, 1989 Agreement to be a binding acquisition contract. In fact, the Court found that the express terms of the June Agreement clearly demonstrated an intent not to be bound. Among other things:

– The language of the June Agreement expressly conditioned a final agreement on board approval and final pricing;

– The June Agreement anticipated execution of a *"final definitive"* portfolio purchase agreement; and

– The parties never agreed on several material contract terms, including which

*assets* would be *purchased* and which *liabilities* would be *assumed* and neither term could be determined by any method or formula.

142 B.R. at 660 (emphasis in original).

This appeal followed.[4] The broad issue before this Court on appeal is whether the Bankruptcy Court erred in granting ACS's motion for summary judgment disallowing CMI's claim.[5] CMI claims that the Bankruptcy Court erroneously limited its decision to an interpretation of the written June 28, 1989 Agreement. According to CMI, the Bankruptcy Court ignored CMI's position, and the evidence, that the June Agreement was an essential part of, but not the exclusive basis for, the parties' contract. CMI further claims that a look at the complete record demonstrates that the parties reached an agreement by June 30, 1989 on all material terms for ACS to acquire essentially all the assets and most of the liabilities of SMI, and thereafter acted on that agreement. According to CMI, by June 30, 1989, a final definitive agreement, the Portfolio Purchase Agreement, was drafted by ACS and by CMI/SMI. The assets being purchased and the liabilities being assumed were identified in that document. Moreover, after June 30, 1989, nothing was left to be negotiated. The only event left was approval of the Portfolio Purchase Agreement by ACS's Board of Directors. In the alternative, CMI alleges that the June 28, 1989 Agreement at least obligated ACS to act in good faith toward concluding and performing the acquisition. Based on the foregoing, CMI seeks a reversal of the Bankruptcy Court's order granting summary judgment disallowing CMI's claim.

## DISCUSSION

### I. Standard of Review

As indicated, the Bankruptcy Court granted summary judgment in favor of the

---

**4.** The Court has jurisdiction to hear this appeal from the order of the Bankruptcy Court in accordance with 28 U.S.C. § 158(a).

**5.** In its Brief on Appeal From the Order of the Bankruptcy Court Disallowing the Claim of Commercial Marketing, Inc. ("Appellant Mem."), at 1, appellant CMI argues that there

are actually five issues on appeal, the first being the one cited above. The Court finds, however, that the other issues cited by appellant are little more than restatements of the central issue, namely, whether the Bankruptcy Court's ruling granting summary judgment disallowing CMI's claim was proper.

debtor/appellee and disallowed the claim of CMI in its entirety. The grant of a motion for summary judgment by the Bankruptcy Court is subject to *de novo* review by the District Court. *In re Fugazy Express, Inc.*, 124 B.R. 426, 430. (S.D.N.Y.1991) (citing *Royal Bank and Trust v. Pereira*, 99 B.R. 536 (S.D.N.Y.1989)).

## II. Summary Judgment

■ The Court agrees with the Bankruptcy Court that in contract cases where "a question of intention is determinable by written agreements, the question is one of law, appropriately decided ... on a motion for summary judgment." *See In re Atlantic Computer Sys. Inc.*, 142 B.R. at 659 (citing *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989)). The Court also agrees that in this case the intent of the parties can be readily ascertained by examining the terms of the written agreements between them. Accordingly, summary judgment is appropriate.

## III. Governing Law

■ As the Bankruptcy Court recognized, it is a fundamental principle of contract law that no contract can be formed unless the parties intend to be bound. *In re Atlantic Computer Sys. Inc.*, 142 B.R. at 660 (citing *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)). In *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y. 1987), the Court set forth a framework for determining the intentions of the parties in the context of "preliminary agreements." The Court noted that "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Id.* at 499. Nevertheless, there are at least two types of binding preliminary agreements. In the first, "the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation," but they have not yet completely formalized their agreement. *Id.* at 498. In the second, the parties have committed themselves to some major terms, while recognizing the existence of open terms that remain to be negotiated. *Id.* Of this second type, the Court stated that "the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *Id.*

■ To determine whether there was intent to form a binding preliminary agreement of the second type, the following factors must be considered: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form. *Id.* 499–503. In *Arcadian Phosphates*, 884 F.2d at 72, the Second Circuit adopted the *"Tribune* framework" and indicated that the first *Tribune* factor, i.e., the language of the agreement, is the most important. *See also Ogden Martin Sys. Inc. v. Tri–Continental Leasing Corp.*, 734 F.Supp. 1057 (S.D.N.Y.1990).

## IV. Analysis

A review of CMI's submissions indicates that it alleges that there is at least a genuine issue of fact as to whether either type of preliminary agreement exists. CMI contends that by June 30, 1989, the parties had reached complete agreement on all issues perceived to require negotiation, or in the alternative, that the June 28, 1989 Agreement expresses mutual commitment to a contract on agreed major terms, requiring at least a good faith effort to reach final agreement. The Court disagrees.

■ With respect to the first type of preliminary contract, the Court finds, as a matter of law, that the parties had not, by June 30, 1989, reached complete agreement on all issues, including being bound. Although it is true that there was some preparation by the parties for the possible acquisition of SMI by ACS, there was not complete agreement. The express terms of the June 28, 1989 Agreement make clear that the parties had not agreed on several

material contract terms, including which assets would be purchased and which liabilities would be assumed. Moreover, even assuming that the two parties jointly prepared the final Portfolio Purchase Agreement by the end of June, and the terms of that Agreement were agreed upon by the parties, that Agreement does not precisely set out which assets were to be involved in the purchase. *See* Portfolio Purchase Agreement, at ¶ 3.1, Schedule 3.1, Schedule 3.1A, attached to CMI's Opposition to Debtor's Motion to Disallow Claim No. 559. In addition, it is undisputed that in early July the parties were still negotiating, through a series of letters, indemnifying ACS with respect to litigation involving Robert Russell, the former owner of SMI.[6] And, it was not until some time in July that an indemnification agreement was included in the Portfolio Purchase Agreement. Finally, there is no indication that by June 30, 1989, both parties agreed to be bound. The June 28, 1989 Agreement anticipated execution of a final Portfolio Purchase Agreement, and expressly conditioned a final agreement on board approval.

■ As to the second type, the Court agrees with the Bankruptcy Court that in applying the *Tribune* test, the Court need not look further than the first factor, i.e., the language of the June 28, 1989 Agreement. The Court also agrees that a review of the language of the June Agreement indicates that there was no binding preliminary commitment, obligating the parties to negotiate open issues in good faith. Unlike the letters constituting the commitment agreement in *Tribune*, the June 28, 1989 Agreement makes no reference to a "binding agreement" between the parties. This language was critical to Judge Leval's determination in *Tribune* that a binding preliminary commitment existed. *See Arcadian Phosphates*, 884 F.2d at 72–73. Moreover, the June Agreement anticipates execution of a final definitive Portfolio Purchase Agreement and contains no information on the assets to be purchased or the liabilities to be assumed. Finally, although language reserving rights of approval is not always incompatible with intention to be bound, *see Tribune*, 670 F.Supp. at 500, when viewed in the context of the overall June Agreement, including the factors cited above, such a reservation indicates an intention not to be finally bound.

Thus, based upon the plain language of the June 28, 1989 Agreement, the Court finds that the June Agreement did not constitute a binding preliminary commitment, requiring good faith negotiation toward a final contract. "[A]s in *Arcadian Phosphates* and *Ogden Martin Systems*, the language of the June Agreement fails to overcome the presumption not to be bound and instead, indicates precisely otherwise." *In re Atlantic Computer Sys. Inc.*, 142 B.R. at 660.

Accordingly, the Bankruptcy Court's order granting ACS's motion for summary judgment and disallowing CMI's claim in its entirety is affirmed.

## CONCLUSION

For the reasons set forth above, the Bankruptcy Court's order granting ACS's motion for summary judgment and disallowing CMI's claim is affirmed. This Order closes the case.

SO ORDERED.

---

6. *See* Letter from Smell & Wilmer to Mr. John Tompkins, dated June 28, 1989, attached as Exhibit "11" to CMI's Opposition to Debtor's Motion to Disallow Claim No. 559; Letter from Vaughn W. Duff, Vice President and Corporate Counsel of ACS, to William Bresnahan, President of SMI, dated July 5, 1989, attached as Exhibit "11" to Opposition to Debtor's Motion to Disallow Claim No. 559; Letter from Michael Minor, President of CMI, to Vaughn Duff, dated July 6, 1989, attached as Exhibit "12" to Opposition to Debtor's Motion to Disallow Claim No. 559.