**OGDEN MARTIN SYSTEMS OF TULSA, INC., Plaintiff,**

v.

**TRI–CONTINENTAL LEASING CORPORATION, Defendant.**

**No. 86 Civ. 8008 (RWS).**

United States District Court, S.D. New York.

April 12, 1990.

Coleman & Rhine (Howard I. Rhine, R. Jeffrey More, Joseph E. Gasperetti, Bonnie H. Weinstein, of counsel), New York City, for plaintiff.

Winick & Rich, P.C. (Susan G. Rosenthal, Kevin J. Farrelly, Rita M. Jennings, of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Defendant, Bell Atlantic TriCon Leasing Corporation, (named as formerly known, Tri–Continental, and referred to as "Tri-Con") has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint of plaintiff Ogden Martin Systems of

Tulsa, Inc. and to recover on its counter-claim for transaction expenses. For the reasons set forth below, this motion is granted.

Parties

Ogden Martin Tulsa ("OMT") is a corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business at 2122 South Yukon Avenue, Tulsa, Oklahoma. Ogden Martin Tulsa is a wholly-owned subsidiary of Ogden Martin Systems, Inc. ("Ogden Martin"), which, in turn, is an indirect, wholly-owned subsidiary of Ogden Projects, Inc. ("OPI"). All are wholly-owned subsidiaries of Ogden Corporation ("Ogden Corp."), a Delaware corporation having its principal place of business in New York, New York. The foregoing entities are hereinafter collectively referred to as "Ogden." Ogden is engaged in the business of owning and operating plants (commonly known as resource recovery facilities) that generate steam and electricity by incinerating municipal waste. Using an incinerator and grate system developed by Martin GmbH of Munich, West Germany, Ogden constructs, owns and/or operates municipal solid waste resource recovery facilities throughout the United States.

David L. Sokol ("Sokol") is the President and Chief Executive Officer of OMT, Ogden Martin, and OPI and is Co–President and a member of the Board of Directors of Ogden Corp.

Defendant TriCon is an indirect subsidiary of the Bell Atlantic Corporation ("Bell") and a direct subsidiary of Bell Atlantic Enterprises Corporation, which in turn is a direct subsidiary of Bell Atlantic Leasing Investments, Inc. which is itself a direct subsidiary of Bell. These entities are collectively referred to as "Bell." TriCon is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 95 North, Route 17 South, Paramus, New Jersey. TriCon loans money and makes other capital investments on behalf of Bell and other corporate members of the Bell Group. At all times relevant to this action, TriCon's investment decisions were made by a group of senior executives called the Senior Review Committee ("SRC").

Each party to the transaction at issue was represented by an investment advisor and by lawyers. Shearson Lehman Brothers, Inc. ("Shearson") and Sullivan & Cromwell ("S & C") acted for Ogden, while Commercial Union Capital Corporation ("Commercial Union") and Dewey, Ballantine, Bushby, Palmer & Wood ("Dewey Ballantine") acted for TriCon. The principal members of the TriCon team were: James Boyan ("Boyan"), TriCon's General Counsel; Mark Camora ("Camora"), President of Commercial Union; William Cordiano ("Cordiano"), Vice President of Commercial Union; Thomas Currier ("Currier"), corporate partner at Dewey Ballantine; Raymond Dombrowski ("Dombrowski"), Bell's in-house tax attorney; Michael Foster ("Foster"), TriCon's Senior Vice President in charge of this transaction; and Everett Jassy ("Jassy"), tax partner at Dewey Ballantine.

Prior Proceedings

Ogden commenced this action in or about October 1986 seeking approximately $1,750,000.00 in damages for an alleged breach of contract. On January 8, 1987, TriCon interposed an answer and counterclaim and, on August 24, 1988, with leave of Court, an amended answer and counterclaim. On August 18, 1989, TriCon moved for summary judgment before The Honorable John M. Walker, Jr., and the motion was considered submitted as of December 1, 1989. Following the appointment of Judge Walker to the Second Circuit, this action was reassigned. Pursuant to the request of the parties and the court, the motion was reargued on January 19, 1989, and the motion was considered fully submitted as of that date.

The Pleadings

The complaint alleges that TriCon breached its contractual obligations to purchase from Ogden and to lease back to Ogden a municipal solid waste resource recovery facility (the "Facility") located in Tulsa, Oklahoma. On the basis of Ogden Martin's Private Placement Memorandum (the "PPM") dated May 1986, TriCon's re-

sponses thereto with accompanying letters from Commercial Union to Shearson dated June 6, 10, and 17, 1986 and certain conversations memorialized in a letter of June 20, 1986 from Shearson to TriCon awarding TriCon the transaction (the "June 20 Award Letter"), the Complaint alleges that Ogden and TriCon entered into a binding contract to consummate a sale and leaseback financing of the Facility. It is further alleged that on or about July 19, 1986, TriCon dishonored its obligation to consummate the sale and leaseback financing by willfully and without justification backing out of the transaction and terminating negotiations. As a result, Ogden was forced to seek alternative financing and, at increased expense, to sell and leaseback the Facility to a company called CIT Group Equipment Financing, Inc. ("CIT") on August 2, 1986. In so doing, Ogden alleges it suffered contractual damages of nearly two million dollars, the difference between the amount of money TriCon promised to pay Ogden and the amount of money which CIT did pay Ogden together with the increased costs, fees and expenses incurred by Ogden.

Ogden advances as an alternative theory that the exchange of the documents referred to above indicates that the parties had reached agreement on all the essential terms of the proposed sale and leaseback and by virtue of the custom and practices of the leveraged leasing industry, the parties mutually and expressly bound themselves to do all that good faith required to consummate the sale and leaseback financing. Ogden alleges that TriCon breached that obligation when it aborted the financing in the fashion and for the expressed reason that it did on July 18, 1986.

TriCon's Answer and Counterclaim ("Answer") alleges that TriCon's undertaking to proceed with the sale and leaseback financing did not evidence intent to be bound and was subject to a number of conditions precedent, including Ogden's obligation to tender insurance "reasonably satisfactory" to TriCon, and the execution of certain additional documents. The Answer alleges that those conditions precedent were never satisfied.

The Answer includes a counterclaim alleging that "when TriCon accepted Ogden's offer" (the June 10 letter), TriCon and Ogden agreed that if the transaction did not close for any reason other than a "default by the Owner Participant [TriCon] in making its investment" Ogden would pay Tricon's transaction expenses. The Answer alleges that TriCon's refusal to perform the sale and leaseback financing on July 18, 1986 did not constitute a default by it, and therefore Ogden is obliged to pay all the transaction expenses TriCon incurred in connection with the aborted sale and leaseback. Last summer Tricon amended its Answer, adding counterclaims alleging that Ogden breached the duty to bargain in good faith, and fraud. Further, the Amended Answer alleges that Ogden fraudulently enticed TriCon into the proposed sale and leaseback by not disclosing to TriCon the actual state of the environmental laws as of May 1986 and the imperfections of environmental science. TriCon seeks indeterminate damages on these counterclaims.

Facts

OMT was created in 1984 for the specific purpose of designing, constructing, and operating the Facility located in Tulsa, Oklahoma. The Facility consists of the first and second units of a mass burn solid waste disposal, steam and electric power generating resource recovery facility. The Facility receives and stores solid waste, burns the waste, and produces steam and/or electricity. Along with a third unit which was expected to be completed in 1988 (the "Third Unit"), the Facility was designed to process up to 1,125 tons of solid waste per day and generate approximately 16.5 megawatts of electricity or 240,000 pounds of steam per hour.

On or about April 9, 1984, Ogden entered into a service agreement (the "Service Agreement") with the Tulsa Authority for Recovery of Energy ("TARE"), a municipal agency responsible for the collection of residential, commercial and light industrial solid waste in the City of Tulsa, whereby TARE agreed, for an initial period of twen-

ty-one years, to supply to the Facility an annual minimum of 219,000 tons of solid wastes and pay Ogden a service fee for the disposal of the waste.

Prior to May 1986, Ogden determined to enter into a sale/leaseback financial transaction whereby it would sell the Facility and Third Unit to an owner trust established for the benefit of an institutional equity investor which, in turn, would enter into a lease of the Facility to Ogden. Ogden engaged Shearson as its financial advisor and exclusive placement agent for the purpose of arranging equity participation of the leaseback of the Facility. Although Ogden had constructed other resource recovery facilities, this was to be the first time that one of its facilities would be the subject of a sale/leaseback transaction.

In May 1986, Shearson issued to potential investors, including TriCon, the PPM describing the proposed sale/leaseback of the Facility. The PPM set forth the terms for the proposed sale/leaseback and invited potential investors to submit proposals for the acquisition of the Facility and the Third Unit and its leaseback to Ogden. Part IV of the PPM, headed "Summary of Proposed Terms" (the "Term Sheet") set forth the essential details for the proposed transaction.

The Term Sheet included the following relevant terms:

Paragraph VI

*Facility Cost; Third Unit Cost:* The total cost of the Facility will equal the fair market value of the Facility on the Facility Closing Date as determined by a qualified independent appraiser. The Facility Cost is expected to be approximately $85,000,000.00. The total cost of the Third Unit, if included, will equal the fair market value of the Third Unit on the Third Unit Closing Date as determined by a qualified independent appraiser. The Third Unit Cost is expected to be approximately $45,000,000.00

The Owner participant's equity commitment in each case will be sufficient to accommodate a variation of 10% in Facility Cost and Third Unit Cost.

Paragraph VIII

*Closing Dates:* It is anticipated that closing and funding of the equity participation for a lease of the Facility will occur on or about July 17, 1986 (the "Facility Closing Date"), at which time construction of the Facility is expected to be substantially complete. The Facility will have been placed in service for tax purposes not more than 90 days prior to the Facility Closing Date.

The closing and funding of the equity participation for a lease of the Third Unit, if included, is expected to occur during the first quarter of 1988 (the "Third Unit Closing Date"). In order to accommodate any unanticipated construction delays, the Owner Participant's equity commitment for the Third Unit will extend until December 31, 1988.

Paragraph XXIII

*Insurance:* The Lessee will maintain liability and casualty insurance on the Facility in amounts and against such risks, including deductible and self-insurance provisions, consistent with Lessee's obligations under the terms of the Service Agreement between the Lessee and TARE and the Loan Agreement between the Lessee and the TPFA; *provided, however,* that casualty insurance will be in an amount equal to Stipulated Loss Value.

Paragraph XXIX

*Tax Indemnifications:* The Lessee will indemnify the Owner Participant against the actual loss of any Tax Benefits resulting primarily and directly from any act or omission of the Lessee, other than those required or expressly permitted by the terms of the Lease, or any breach of the Lessee's representations.

The Lessee will not indemnify the Owner Participant for any loss of Tax Benefits resulting from a change in the Code, the income tax regulations or any other laws or regulations. In addition, the Lessee's obligations to indemnify the Owner Participant will be subject to other excep-

tions customary in leveraged lease transactions.

The Lessee will have the option to finance any required indemnity payment to the Owner Participant as supplemental rent, either as a lump sum payment or in installments over the remaining term of the Lease.

The Owner Participant will contest any claim made by the Internal Revenue Service through initial and appellate judicial levels with respect to any loss which would require indemnification by the lessee, provided a tax opinion is furnished to the Lessor by the Lessee from an independent tax counsel reasonably acceptable to the Lessor to the effect that a reasonable basis exists for such contest. The Owner Participant will not settle any contest without prior consent of the Lessee.

### Paragraph XXXV

*Transaction Expenses:* In the event that this transaction does not close for any reason other than the Owner Participant's failure to close on substantially the same terms and conditions as set forth herein, the Lessee will pay the reasonable fees and expenses of the Owner Participant's counsel.

### Paragraph XXXVI

*Conditions Precedent to the Commitment of the Owner Participant:* The commitment of the Owner Participant will be subject to (i) satisfactory documentation; (ii) receipt by the Owner Participant of satisfactory opinions of counsel; (iii) receipt of an independent appraisal to the effect that: (a) the Facility has an estimated useful life of at least 32 years from the commencement of the Basic Lease Term, (b) after taking into account the arrangements outlined herein, at the end of the Basic Lease Term the fair market value of the Facility on site at that time is reasonably estimated to be at least equal to 20% of Facility Cost on the Facility Closing Date, without regard to inflation or deflation during the Basic Lease Term and (c) after taking into account the arrangements outlined herein

it is reasonable to expect that it will be commercially feasible for the Lessor or a third party to operate the Facility on site at the end of the Basic Lease Term during the remaining term of the Ground Lease; and (iv) receipt of all consents and regulatory approvals, if any, required to permit the Lessor and the Owner Participant to own the Facility and lease it to the Lessee pursuant to the Lease and for the operation of the Facility.

In addition, Section I of the PPM (at page 2) contained the following statement:

The Facility will not include the underlying land; Ogden Martin Tulsa will lease the land to the Lessor pursuant to a ground lease agreement (the "Ground Lease").

Section III of the PPM discussed the types of waste that will and will not be accepted for burning at the Facility:

The Facility has been designed to dispose of "Acceptable Waste", which includes all material normally found in municipally collected residential solid waste and most types of commercial and light industrial solid wastes. The Facility will not be required to accept noncombustible construction material, demolition debris, bulky noncombustible materials, hazardous wastes, or other materials which are likely to adversely affect the operation of the Facility or cause a violation of environmental laws or regulations.

As to the bidding procedures, the Summary of Proposed Terms states:

Any exceptions to the Summary of Proposed Terms should be specified; the Summary of Proposed Terms and the statement of any exceptions to it will constitute the Owner Participant's [the Lessor's] proposal. Entirely new term sheets will not be accepted.

\* \* \* × \* \*

Proposals should be submitted to Shearson Lehman by the date specified in the cover letter which accompanies this Memorandum. Shearson Lehman will consider all proposals *final.* Proposals

should be *firm,* subject only to a final [credit] committee approval.

(emphasis added).

TriCon's Bids

By letter dated May 22, 1986, Commercial Union sent the PPM to Foster. Foster, Commercial Union, and Dombrowski, then prepared TriCon's June 6, June 10, and June 17, 1986 written proposal for the sale and leaseback of the Facility. The June 10 proposal incorporated the economics proposed in the June 6 letter and the June 17 letter changed some of the economics proposed on June 6 and then incorporated in the June 10 Offer.

In the days preceding the June 6 letter, Cordiano, who was assigned by Camora of Commercial Union as the transaction designee, conducted the first review of the PPM and directed that the PPM be sent to Foster. Cordiano made a series of handwritten notes in connection with his review of the PPM and those notes, according to Ogden, demonstrate Cordiano's technical prowess. Cordiano also made a memorandum dated May 29, 1986 called *Review of Ogden Corporation Transaction.* In that memo, Cordiano noted that Marshall & Stevens, independent appraisers, should be contacted. On deposition, Cordiano acknowledged that he had spoken with Marshall & Stevens in connection with the preparation of TriCon's bid on the Facility. Dombrowski also spoke with Marshall & Stevens to evaluate the anticipated useful life of the Facility. On June 4, 1986, Cordiano transmitted the first draft response to the PPM's Summary of Terms and conditions to Foster.

The June 6 letter from Cordiano to Rowan at Shearson contained a summary of the key economic terms of TriCon's forthcoming bid, promising to forward the full proposal as soon as possible. The June 6 bid proposed the following essential economic terms: (a) TriCon would acquire the First and Second Units of the Facility for $85,000,000, which would be paid by TriCon's assumption of the $58,475,000 Bond debt to the TPFA plus TriCon's contribution of $17,000,000 in equity, plus a note payable to Lessee over five years in the amount of $9,525,000; (b) Ogden would lease the Facility under a 25.5 year lease for an amount equal on the Closing Date to 71.74% of the Purchase Price; (c) the Lease Rate would be 6.92% of the Facility cost; and (d) TriCon proposed to apply a 10.25% discount factor in arriving at these figures.

The June 10 TriCon Letter

The June 10 letter incorporated the June 6 letter's provisions. The letter recited that "Tricontinental Leasing Corporation has reviewed and agrees with the terms of this proposal" and that TriCon "look[s] forward to working with you." TriCon's response, however, identified TriCon's "major exceptions" to the Term Sheet and stated in the first sentence of its opening paragraph that "other issues may arises (sic) during negotiations...." According to TriCon, this June 10 letter signaled that TriCon did not expect all issues involved in this proposed transaction to be resolved until the parties had had the benefit of further negotiations to be conducted by the legal teams of both sides. According to TriCon, at the time it prepared the Response, TriCon was unaware of the environmental risk issue, an issue it claims led to the termination of this transaction.

The Response included the following exceptions to the Term Sheet:

*Insurance:* The terms and conditions of the insurance coverages will be reasonably satisfactory to the Owner Participant (i.e., Tri–Continental).

*Transaction Expenses:* Transaction Expenses are all costs and expenses of documenting and closing this transaction, including all outside counsel fees, engineer and appraisal fees, initial fees of the Owner Trustee and Indenture Trustee, the fee of Shearson Lehman Brothers Inc., title insurance, printing costs and other reasonable out-of-pocket expenses of the Owner Participant and the advisor to Owner Participant's independent tax counsel, the Owner Participant agrees to include as part of Transaction Expenses, the costs and expenses of Lessee's Counsel.

Ogden Tulsa will pay all Transaction Expenses if this transaction is not consummated for any reason other than a default by the Owner Participant in making its investments, in which case the Owner Participant will pay its own expenses, or to the extent that Transaction Expenses are not financed as part of lessor's Cost.

*Conditions Precedent:* In addition to conditions Precedent included in the Private Placement Memorandum and other conditions precedent generally found in facility financings of this type, the commitment of the Owner Participant will be subject to (a) receipt of all necessary approvals by the Owner Participant; (b) satisfactory review by the Owner Participant's Independent Appraiser; (c) no material adverse change having occurred in the business, financial or operating condition of the Lessee or Guarantor on or prior to either Closing Date; and (d) in the case of the Third Unit, no material adverse change in the viability or economics of the Facility or the Third Unit.

According to TriCon, the provision relating to insurance was a typical provision demanded by Tricon in leasing transactions, and TriCon never agrees to accept the risks related to the subject matter of the transaction. To ensure this demand is met, TriCon typically insists that the lessee supply the proof of satisfactory insurance prior to consummating the proposed transaction. This transaction was no exception; TriCon demanded that Ogden provide sufficient insurance on the Facility.

Ogden's Response

TriCon's written bids were supplemented by several oral conversations between Cordiano and Rowan. The bidding process ended on June 18, 1986 when Rowan orally awarded the transaction to TriCon. According to Ogden, Rowan formally confirmed the Award in the June 20, 1986 Award Letter.

The Letter did not alter the terms of the provision in the Response relating to insurance on the Facility nor any other provision containing a condition precedent to the closing of the proposed transaction. No mention was made of the statement cautioning that other issues might arise during negotiations and the letter did not contain any language indicating that this letter confirmed an intent by the parties to be bound. Instead, the letter stated "[w]e look forward to completing this transaction with you in an expedited and professional manner."

On or about June 20, 1986, TriCon retained Dewey Ballantine to represent it for purposes of negotiating the documents for the sale/leaseback of the Facility. TriCon chose Dewey Ballantine because of its expertise in negotiating sale/leaseback transactions and because it could be expected to draft and finalize the voluminous documents necessary for the transaction in a short period of time.

As of June 20, 1986, the parties began negotiations for an intended closing of July 18, 1986. The short negotiating period resulted from Ogden's desire to have an early closing date to ensure the availability of the Investment Tax Credit and the resulting favorable pricing to Ogden. Shortly after June 20, TriCon's SRC signed the Credit Review and approved the sale and leaseback.

Documents

Dozens of documents had to be negotiated, drafted, and agreed to before the closing of the proposed transaction, including the tax indemnity agreement (the "TIA"). Inasmuch as the main purpose of a sale/leaseback transaction from the lessor's perspective is the obtaining of certain tax benefits, the TIA was a crucial document because it would set forth the specified instances wherein Ogden would be required to indemnify TriCon in the event the IRS denied anticipated tax benefits to TriCon.

Unknown at the time of the June 20 Award letter but revealed to all parties shortly thereafter, Oklahoma's fraudulent conveyance law would require the Underlying Land as well as the Facility to be sold to TriCon. The PPM had provided only for Ogden to sell the Facility. Therefore, to avoid a fraudulent transfer, all parties agreed that the Underlying Land had to be reduced to writing to consummate the pur-

chase. As of July 18, 1986, however, a document providing for this conveyance remained unexecuted.

July 14: The Close Presentation and The Environmental Issue

By early July, the TriCon team raised the issue of potential liability of the owner of the Facility for any impairment of the environment. With respect to this issue, Boyan requested to speak with a Dewey Ballantine attorney with experience in this area. Jassy arranged for Close, an experienced lawyer in the "waste-to-energy" field, to brief the TriCon team on environmental issues.

On Monday, July 14, 1986, Close discussed with the TriCon team the potential liability of an owner/lessor of a resource recovery facility and the relevant environmental laws. According to Close, under various federal laws, TriCon could be liable as an owner/financier for hazardous waste problems. Close believed that it was possible that the ash produced by the Facility would be considered hazardous waste. Moreover, Close stated that environmental impairment insurance was difficult, if not impossible, to obtain. Consequently, under the environmental laws, in the event that TriCon were held liable for any clean-up or damage, courts could easily pierce the corporate veil between TriCon and its corporate parents, in this case Bell. Close also discussed Oklahoma's strict liability law under which TriCon could be liable for damages in tort as a result of the emissions from the Facility.

According to TriCon, this information "came as a bombshell" in that TriCon is not in the business of manufacturing, owning, or operating resource recovery facilities and therefore had "no prior knowledge of these issues." According to Tricon, it had no prior awareness of its or Bell's potential liability under the environmental laws and that Ogden had not informed it of the risks in the PPM or the negotiations held up to that time. Ogden disputes Tricon's knowledge by claiming that one of the members of the SRC, Frank LaBrake, had and read a Shearson Research Report on the waste-to-energy industry replete with the attendant

potential environmental liabilities. Moreover, Ogden claims that the proposed transaction fits within TriCon's past pattern of energy-related investments and that in 1985 TriCon took a major financial interest as equity lessor and owner in the Santa Fe Geothermal Facility, a deal which did not involve Ogden but on which Foster, Dombrowski, and Boyan had all worked and noted the environmental issues.

The two teams of attorneys continued negotiation of the closing documents and exchanged several drafts. Most of the open issues involved indemnification with respect to the TIA. Boyan contacted Sokol to discuss the manner in which the Facility was to dispose of ash residue, and Sokol admitted that Ogden was still in the process of discussing the procedure with the City of Tulsa. Sokol also noted that the environmental impairment insurance available was so minimal as to be inconsequential and that Ogden maintained none on the Facility. Sokol sought to ease TriCon's concerns by reminding Boyan that Tulsa would indemnify TriCon for any damage caused by the operation of the Facility and at one point, Sokol offered to give TriCon an indemnification from Ogden Corp. According to TriCon, these indemnifications were worth only as much as the value of the assets of either and in the event of an accident in which the Facility caused catastrophic injuries and damage, the indemnification would be insufficient. Boyan also called A.J. Robertello ("Robertello"), the Director of Risk Management and Insurance at Bell. Robertello confirmed there was little if any impairment insurance available on the market. Finally, Close contacted David Paget, ("Paget") a renowned environmental law expert and partner at Sive, Paget & Riesel, to obtain more expert advice for TriCon.

July 18: The Death of the Transaction

On July 16 and 17, the attorneys for both parties met and negotiated in an attempt to resolve the open issues. Boyan executed the Trust Agreement between Tricon and Meridian Trust Company as Owner Trustee, and established the Ogden Martin Resource Recovery Trust. Pursuant to the

PPM, the Trust was designed to execute and deliver the operative documents required to perform the financing of the transaction. During the evening of July 17, the TriCon team prepared another version of the TIA which contained assumptions and terms to which Ogden had not agreed and hand delivered it to Ogden's team the next morning.

On the morning of July 18, some of the TriCon team met to discuss the open issues in the transaction and TriCon's strategy for the afternoon meeting with Ogden. Because the environmental issue still loomed, Foster and others went to Dewey Ballantine's offices to meet with Paget and an associate. Paget confirmed the accuracy of the Close presentation and discussed further potential for liabilities to arise.

Following this discussion, the Tricon team went to S & C's offices, and Foster presented TriCon's concerns. Sokol responded that insurance was unavailable but that the risks involved were so minimal that TriCon should not be concerned. Foster placed another call to Paget to verify that Foster fully understood the environmental issues and the applicable law. Foster returned and informed Sokol that Tricon would not purchase the Facility because of the environmental risks and Ogden's admitted inability to provide satisfactory insurance.

Transaction Expenses

TriCon and Ogden agreed that Ogden would pay all of TriCon's transaction expenses if the sale/leaseback of the Facility was not consummated for any reason other than a default by TriCon. The transaction expenses include TriCon's attorneys' fees incurred in the transaction and TriCon has asserted a counterclaim against Ogden for these fees.

Standards for Summary Judgment

This summary judgment motion presents four questions: (1) whether the parties entered into a binding contract of the sale and leaseback of the Facility; and (2) if so, whether TriCon breached that contract, or (3) alternatively, whether the parties contracted to bargain in good faith toward the sale and leaseback of the Facility; and (4)

if so, whether TriCon or Ogden breached that contract.

To grant summary judgment the court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court's responsibility is not to resolve disputed issues of fact, *Donahue v. Windsor Lock Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). Summary judgment enables the court to dispose of meritless claims before becoming entrenched in a costly trial. *Donahue*, 834 F.2d at 58, (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

In a contract case "where 'a question of intention is determinable by written agreements, the question is one of the law, appropriately decided … on a motion for summary judgment.'" *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989) (citing *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291, 298 N.E.2d 96, 100, 344 N.Y.S.2d 925, 930 (1973)). In the present case, the facts are to be viewed in the light most favorable to Ogden, the non-moving party, with all reasonable inferences drawn in its favor.

The Governing Law

■ It is an elemental principle of contract law that no contract can be formed unless the parties intend to be bound. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984). To find either a complete agreement or a preliminary binding agreement to negotiate open terms in good faith a court must find the existence of an intent to be bound. *See Teachers*

*Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987). In a complete agreement this intention to commit will embrace a recognition that a contract has been achieved, despite the need to memorialize in writing the agreement or attend to further formalities. *Id.* In a preliminary binding agreement there need not be a commitment to the underlying contract, but rather a commitment to negotiate the open issues of that agreement in good faith. *Id.*

■ To determine whether an intent to form a binding obligation exists, courts focus primarily on whether the language of the documents reveals an intent not to be bound until execution of a final contract and whether the terms of the contract have been finally resolved. *Arcadian,* 884 F.2d at 72. *See Winston,* 777 F.2d at 80; *R.G. Group,* 751 F.2d at 75; *ABC Trading Co. v. Westinghouse Elec. Supply Co.,* 382 F.Supp. 600, 601 (E.D.N.Y.1974). Additionally, courts may look at the context of the negotiations, whether there exist open terms, whether there has been partial performance; and the necessity or practice of the industry of putting the agreement in final form. *Arcadian,* 884 F.2d at 72 (citing *Tribune,* 670 F.Supp. at 499–503 (adopting test set forth by Judge Leval for determining whether there exists intent to be bound)).

The Second Circuit applied this test in a case remarkably similar to the case at bar. In *Arcadian,* the court held as a matter of law, that, even where a writing is asserted to be a preliminary agreement to negotiate, a writing which anticipates execution of a final contract and which lacks an express statement that it is to be a binding contract, is unenforceable as a contract. *See Arcadian,* 884 F.2d at 72–73.

*Arcadian* involved the sale of the defendant's phosphate fertilizer business to the plaintiff with the defendant maintaining a five to twenty percent interest in the business. *Id.* The parties signed a one-and-a-half page memorandum agreement incorporating most of the essential terms of an earlier proposed contract, including assets to be purchased, the price, an option, and a deadline/closing date by which all further action was to be complete. *Id.* All of these terms were to be subject to Board approval and ability to secure financing. *Id.* The agreement left other terms open for future agreement but the memorandum stated that both parties agree "to cooperate fully and work judiciously in order to expedite the closing date and consummate the sale of the business." *Arcadian,* 884 F.2d 69 at 70–71. Finally, the defendant in *Arcadian* decided that, because of the sudden profitability of the phosphate fertilizer business, it wanted to retain majority ownership of and management over the business. *Id.* at 71. The plaintiff refused to agree to this, terminated negotiations, and instituted an action for breach of contract. *Id.*

On a motion for summary judgment, the Second Circuit held the memorandum agreement insufficient as a contract either to negotiate or to enter into the ultimate transaction. *See id.* at 72. Central to the court's decision was that the memorandum stated that a "binding sales agreement will be completed by December 31, 1986" and that "the service and supply agreement will be negotiated and agreed to by December 31, 1986." *Id.* at 70. The court reasoned that this language demonstrated that the parties did not intend to be bound to the ultimate transaction until some time in the future. *Id.* at 72. In so holding, the court found that the memorandum's reference to the anticipated signing of a final contract precluded a finding of a preliminary contract to negotiate in good faith to reach a final agreement. *Id. See also, Reprosystem B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir.1984), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (condition requiring satisfactory documentation was proof of intent not to be bound prior to execution of final documents).

In reaching this determination, the Second Circuit reviewed the holdings of *Tribune* and *Teacher's Ins. & Annuity Ass'n of America v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986) on which Ogden relies extensively. In *Tribune,* the court recog-

nized the existence of a preliminary agreement to negotiate, despite the existence of open terms, holding that the traditional test employed to determine whether parties intend to be bound, is less stringently applied where the agreement is one to negotiate rather than to enter into the ultimate contract. *Tribune*, 670 F.Supp. at 498–99. However, the *Arcadian* Court emphasized that, in *Tribune*, the writing at issue expressly stated that upon execution "our agreement ... shall become a binding agreement between us." *Id.* at 494. This crucial language was not included in the memorandum agreement in *Arcadian*. Instead, the *Arcadian* memorandum included "two references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date...." *Arcadian*, 884 F.2d at 72. Accordingly, the *Arcadian* Court noted that, while the factors typically indicative of an intent to bound are applied slightly differently where a preliminary agreement is at issue, there is still a "strong presumption against finding a binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Arcadian*, 884 F.2d at 73 (quoting *Tribune*, 670 F.Supp. at 499). The Second Circuit concluded that, although in *Tribune* "the language of the agreement argued persuasively for overcoming this presumption; here, the language of the agreement argues persuasively for letting the presumption stand," *Arcadian*, 884 F.2d at 73.

The Intent to be Bound and the Writings

 The writings in this case consist of the PPM, the TriCon June 10 letter response to the PPM, the June 20 Award letter embodying the oral discussions between Shearson and Commercial Union, and the various documents drafted, only one of which—the Trust Agreement—was executed. The writings are incapable of enforcement as a contract inasmuch as they are devoid of any indication that the parties intended them to form a binding

obligation. On the contrary, the express language of the writings and the existence of numerous open terms establishes as a matter of law, that the parties did not intend to be bound prior to the negotiation and execution of a formal contract on the closing date set for July 18, 1986. *See Arcadian*, 884 F.2d at 73 (where intent can be determined by examining writings, summary judgment appropriate even where considerable partial performance).

The intent not to be bound until a future date is first expressed by Ogden in the PPM. Drafted by Ogden, the PPM expressly conditioned the commitment of the parties on the preparation of satisfactory documentation. *See PPM* § XXXVI. In reply, TriCon stated in the opening paragraph that "[a]lthough other issues may arise during negotiation, we have identified below our major exceptions to your Summary of Proposed Terms". Several of the provisions of this June 10 letter were left incomplete, with the proviso that they would be supplemented by such terms as "are typically included in the facility financings of this type". Additionally, the reply is replete with references to terms that still need to be "mutually agreed to" at a future time, including the key tax indemnification agreement, the events of default, conditions precedent other than those enumerated, lessor's representations other than those enumerated, and terms of the Facility support agreement. Finally, the parties explicitly contemplated the possibility that a final contract would not be executed inasmuch as Ogden provided for the payment to TriCon of all transaction expenses should the transaction fail to close.

Ogden contends that the writings indicate that TriCon intended to be, in its own words, "committed" to the transaction. According to Ogden, the June 10 letter constituted an offer using the words "commitment" several times.[1] Further, the letter never expressed any intention not to be bound to the commitment nor did it use language calculated to disclaim any such

---

1. This word, often referred to commitment after the closing, or to the parties intent to be committed only if the condition precedent were satisfied.

commitment. Finally, Ogden says the writings constitute all of the "essential details" of the transaction that was to be agreed upon.

The issues of fact asserted by Ogden are virtually identical to those raised by the plaintiff in *Arcadian* and disregarded there by the Second Circuit. For example, the memorandum in *Arcadian* was termed an "agreement" by the parties; the defendant obtained lenders' consents after informing them of the "agreed upon" and "signed agreement"; the defendant introduced the principals of the plaintiff to a supplier as the "new owners" of the phosphate facility; and the defendant executed an escrow agreement for the deposit monies with the proviso that it would be nonrefundable except "because of force majeure or [defendant's] default". In addition, the memorandum agreement stated that the parties agreed to "cooperate fully and work judiciously in order to expedite the closing date and consummate the sale of the business." *Id.*

In comparison, the facts that Ogden alleges to demonstrate an intent to be bound by the writings are far less significant. The use of the term commitment cannot be equated to the *Tribune*-type clause describing the letter in that case to be a "binding agreement." Even though the PPM here asked for a "firm" proposal and TriCon used forms of the verb to commit on four occasions in the June 10 response,[2] the context of the use of these terms parallels the facts in *Arcadian* where the memorandum was even labeled as an "agreement" rather than in *Tribune*. In *Tribune*, the parties described the letter as a binding agreement and in *Butler* the parties agreed that their agreement was binding. *Arcadian*, 884 F.2d at 72. This acknowledgement of the binding nature of the writings present in *Butler* and *Tribune* is what led Judge Leval to conclude that "a party that does not wish to be bound can very easily protect itself by not accepting language that indicates a 'firm commit-

ment' or 'binding agreement.'" *Tribune*, 670 F.Supp. at 499.

According to Ogden, in an attempt to reverse the argument, TriCon's failure to draft a provision disclaiming an intent to be bound raises a negative inference, that no disclaimer was intended. The *Arcadian* Court, however, disposed of this issue by stating that "a party that *wishes* to be bound can very easily protect itself by refusing to accept language that shows an intent *not* to be bound." *Arcadian*, 884 F.2d at 73. (emphasis in original). It did not state that a party was obliged to disclaim any intention to be bound precisely because it accepted Judge Leval's reasoning in *Tribune* that "[t]here is a strong *presumption* against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Arcadian*, 884 F.2d at 73 (quoting *Tribune*, 670 F.Supp. at 499).

In this case Ogden did not insert a *Tribune*-type clause indicating an intent to be bound and TriCon did not disclaim any intent to be bound. Between, the two, however, the presumption rests with an intent not to be bound given the open terms and the call for future approval of further contract negotiations. Ogden asserts that TriCon had included such language in other transactions; nevertheless, whether or not TriCon used such a disclaimer in their deals, not involving Ogden, is immaterial. *See Arcadian*, 884 F.2d at 73. Just as in *Arcadian*, the language contained in the writings fails to overcome the presumption not to be bound and instead, indicates precisely otherwise. Moreover, courts are reluctant to impute an intent to be bound when the complexity of the transaction suggests that the parties would require the execution of a final contract. *See, Winston*, 777 F.2d at 80; *R.G. Group*, 751 F.2d at 75, 77; *Reprosystem*, 727 F.2d at 262–63.

---

**2.** Ogden's proffer that TriCon made a judicial admission in its original answer by referring to the June 10 letter as an "offer" is of no import. Not only is the original answer mooted by the amended one, the term is a legal characterization by a party having little bearing on the court's finding.

Other Indicators

Having found that there existed no intent to be bound, the *Arcadian* Court stopped applying the *Tribune* analysis, never reaching the other factors set forth in the *Tribune* opinion. *See Arcadian,* 884 F.2d at 72. A cursory examination of these other factors suggests no reason that the presumption of no intent to be bound should be disturbed.

### 1. Partial Performance

■ To support the claim that there existed an intent to be bound by either a contract or a preliminary agreement to contract, Ogden argues that TriCon partially performed the agreement by executing the Trust Agreement. As a matter of law, however, the execution of the Trust Agreement is not partial performance and constitutes, at best only a preparatory act. *See Shearson Lehman CMO, Inc. v. TCF Banking and Savings,* 710 F.Supp. 67, 71 (S.D.N.Y.1989) (citing *R.G. Group,* 751 F.2d at 75, 76) (mere preparatory acts such as forming a partnership to facilitate transaction are not partial performance). Because the Trust Agreement conferred no value to Ogden who was not even a party thereto, the Trust Agreement merely implemented a trust to facilitate the expected closing and indeed never became operative pursuant to an express provision that stated the Agreement was to have no effect in the event the entire transaction were to not close. More importantly, the *Arcadian* Court found that even where there was considerable partial performance, summary judgment was appropriate when there was no intent to be bound. *Arcadian,* 884 F.2d at 73. Finally, no significance attaches to Ogden's assertion that the SRC unanimously approved the credit rating prior to the termination of the deal. The same fact was raised and ignored in *Arcadian. Id.* at 72.

### 2. Open Terms

■ The existence of open terms does not necessarily defeat an existing contract or preclude a finding of an intent to commit to negotiate an agreement. *See Tribune,* 670 F.Supp. at 498. Typically, parties will agree to major terms and leave open terms requiring subsequent negotiations. *Id.* In the present case, the writings conveyed the need to negotiate further. The June 10 letter identified numerous major exceptions and warned of the possibility of others. Indeed, mid-negotiations, all parties recognized the need to convey the underlying land to avoid Oklahoma's fraudulent transfer statute. Furthermore, the TIA, a critical component of the deal had yet to be drafted in final form. Finally, there existed the enumerated conditions precedent, and the failure to obtain "reasonably satisfactory" insurance, the reason proffered by TriCon for termination. Although open terms may not permit parties who have manifested an intent to be bound to disavow the intent, *Tribune* 670 F.Supp. at 502, where, as here, no intent exists, the open terms militate toward supporting the conclusion that the requisite intent was absent. *Winston,* 777 F.2d at 82–83.

### 3. Context of Transaction and Industry Practice

Finally, Ogden argues that the documents at issue here are entirely customary and binding in the leverage leasing industry and moreover, given TriCon's notoriety from having walked away from a prior deal that they would never had done business with TriCon had these documents not been binding, at least to negotiate in good faith. Taking Ogden's assertion to be true, these factors do not create a contract. The writings present in this case, even if they are boilerplate sale/leaseback documents, do not create an intent to be bound, whatever TriCon's history. On the contrary, if Ogden knew of TriCon's reputation, the insertion of language similar to that found in *Tribune* or *Butler* was necessary to provide that the acceptance of terms indicated an intent to bound. At best, accepted as true and in the light most favorable to Ogden, these factors could only evidence an intent to be bound on Ogden's part, but they do not provide the other half of the equation—TriCon's intent to be bound.

A duty to negotiate in good faith arises only when there is a binding agreement between the parties, *Reprosystem*, 727 F.2d at 264, or a binding agreement to negotiate, *Tribune*, 670 F.Supp. at 498. Whether or not the state of environmental law and hazardous waste insurance was such to create a risk for TriCon, whether TriCon had prior knowledge of this risk, whether this was the real reason TriCon failed to consummate the deal are all immaterial absent the threshold finding of whether there was any sort of binding obligation. Finally, having found no contract, the arguments concerning the conditions precedent and the statute of frauds are not reached.

Conclusion

For the foregoing reasons, the motion for summary judgment is granted. Pursuant to the agreement the parties did reach, Ogden is obliged to pay for TriCon's transaction expenses incurred in the attempt to reach a binding agreement. Submit judgment on notice.

It is so ordered.