ARCADIAN PHOSPHATES, INC., Judas Azuelos, and Eli Sivan, Appellants,

v.

ARCADIAN CORPORATION, Appellee.

No. 1282, Docket 89-7277.

United States Court of Appeals, Second Circuit.

Argued June 16, 1989.

Decided Sept. 1, 1989.

Edwin B. Mishkin, Cleary, Gottlieb, Steen & Hamilton, New York City (Judith A. Ripps, Jessica Sporn Tavakoli, Frances V. Bouchoux, of counsel), for appellants.

Peter J. Gartland, Donovan Leisure Newton & Irvine, New York City (Stephen D. Houck, Cloyd Laporte III, of counsel), for appellee.

Before OAKES, Chief Judge, VAN GRAAFEILAND and PRATT, Circuit Judges.

OAKES, Chief Judge:

This appeal is from a judgment in a diversity suit involving claims for breach of contract and promissory estoppel. The claims are based on a memorandum which described the sale of a fertilizer company's phosphate fertilizer business to a joint venture. The appellants—the potential purchasers, consisting of the joint venture and two individuals involved in its formation—claim that the memorandum was a binding contract. The appellee—the potential seller, the fertilizer company—argues that the memorandum was an unenforceable "argument to agree." The United States District Court for the Southern District of New York, Kevin Thomas Duffy, Judge, granted summary judgment to the fertilizer company. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, No. 87 Civ. 2353 (S.D.N.Y. Feb 27, 1989) (memorandum endorsement). We affirm on appellants' breach of contract claims. Because summary judgment was, however, inappropriate on appellants' promissory estoppel claim, we reverse and remand for further consideration of that claim.

## I. FACTS

Appellee Arcadian Corporation ("Arcadian") is a New York corporation that manufactures and sells fertilizer. Appellant Arcadian Phosphates, Inc. ("API") is a Delaware corporation incorporated in 1986 by appellants Judas Azuelos and Eli Sivan as a vehicle for the purchase of Arcadian's phosphate fertilizer business. Azuelos, a citizen and resident of France, represents the Office Togolais Des Phosphates ("OTP"), the governmental entity in Togo that mines, markets, and exports phosphate rock. Sivan, a citizen of Israel and resident of the United Kingdom, was a businessman engaged in buying and selling Togolese phosphate rock on the world market, and is now the president, treasurer, and one of the directors of API.

In 1986, OTP became Arcadian's chief supplier of phosphate. At the same time Arcadian, allegedly motivated by a sharp drop in the price of fertilizer, began negotiating the sale of its phosphate fertilizer facility in Geismar, Louisiana to API. In June 1986, the parties signed a four-page memorandum of understanding outlining areas of agreement concerning the assets to be purchased, the purchase price, and an option for Arcadian to purchase up to 20% of API. The memorandum also set deadlines for further action, all subject to the approval of Arcadian's board and appellants' ability to obtain financing. After such board approval and appellants' successful but unconsummated search and after further negotiations, the parties signed a one-and-a-half page memorandum on November 6, 1986, that incorporated the June memorandum. It is this November 6 memorandum that appellants claim was a binding contract for the sale of Arcadian's phosphate fertilizer business.

The November 6 memorandum, together with the June memorandum that was incorporated by reference, was termed an "agreement" though subject to approval by the boards of both OTP and Arcadian. It specified the purchase price, the timing and amounts of the payments, the fixed assets to be purchased, and a closing date of not later than May 31, 1987. It also outlined a framework of negotiation for the purchase of Arcadian's finished product inventory at closing at a "mutually agreeable market value," with phosphate stores to be purchased at closing at Arcadian's book value. Other provisions were less definite: for example, the memorandum referred to part of the payment as "a note secured to Arcadian's satisfaction" and to additional equity participants in the proposed joint venture as "subject to mutual agreement." The November 6 memorandum provided that if negotiations for the sale failed, Arcadian would repay any capital expenditures agreed to thereafter and made by API, and if the negotiations failed through no fault of API, Arcadian would refund API's deposit. The November 6 memorandum also stated that "the service and supply agreement will be negotiated and agreed to by December 31, 1986" and [a] binding sales agreement will be completed by December 31, 1986." Finally, both parties agreed to the memorandum "to cooperate fully and work judiciously in order to expedite the

closing date and consummate the sale of the business."

By November 14, 1986, the Arcadian board unanimously approved what Arcadian's CEO then called the "proposed agreement"—though the CEO now says that the board only approved of his proceeding with negotiations. The November 6 memorandum was also approved by OTP. The parties then confirmed by Telex their respective approvals and took steps to consummate the transaction. According to the appellants, these included establishment of API offices at Arcadian headquarters; Arcadian's obtaining lenders' consents after informing them of the "agreed upon" sale with a "signed agreement"; introduction of Azuelos and Sivan to one supplier as "new owners"; and beginning the negotiation of supply contracts for API.

On November 26, API tendered a cash deposit of $687,500 as required. Arcadian executed an escrow agreement for the deposit, referring to the parties' "agreement" and pursuant to which the deposit was to be non-refundable except "because of force majeure or Sellers' default." The minutes of an Arcadian directors' meeting on December 11, 1986, reflect the deposit payment and say that "[f]inal negotiations are continuing to work out the necessary service and marketing agreements," with a closing date of the "venture" to be "no later than May 31, 1987."

On December 17, 1986, Arcadian agreed in writing that its option for 20% minority participation in API could be reduced by API to as low as 5% to enable API to secure financing. API also incurred, it is alleged, expenses of over $100,000 to install "fenders" at Arcadian docking facilities in Geismar, Louisiana, in order to permit the discharge of Togolese rock. API also obtained a bank commitment for the $7 million required for its cash payment toward the $13.75 million purchase price and allegedly entered into a long-term rock supply contract with OTP. According to appellants, Arcadian did not undertake to enter any 1987 supply contract, but merely

extended its existing contract pending the closing. And in January 1987 Arcadian allegedly commissioned a survey which designated which portions of the land and buildings were to go to API and which to remain with Arcadian.

However, as the minutes of the Arcadian board meeting of February 26, 1987, reflect, the market for phosphates changed "dramatically" with market prices of diammonium phosphate, apparently the bellwether of the industry, going up 25% in four to five weeks, production levels increasing, and inventories being depleted. The same board minutes noted:

> [API] is pushing for an early closing and therefore is attempting to lock up financing as soon as possible. However, major issues and concerns still exist from Arcadian's point of view and need to be resolved. The major issues to be negotiated involve inventory transfer, charges for SG & A expenses and insurance coverage. The concerns of Arcadian are the need for retention by Arcadian of majority ownership and control of [API] and the long-term affect [*sic*] on the nitrogen business. After extended discussion it was the consensus of the Board that Arcadian could not proceed with the joint venture as originally contemplated. In order to proceed with any potential joint venture of the phosphate business, it was the consensus of the Board that Arcadian must have majority ownership and management of the venture and the other open issues must be resolved to Arcadian's satisfaction.

When Arcadian informed API of its change of position—from agreeing to own 5% to 20% of the joint venture (at API's option) to wanting to own 50%-plus and returning the down payment—this suit ensued.

## II. DISCUSSION

### A. *Breach of Contract*

As appellants urge, we examine their breach of contract claims [1] under a frame-

---

1. Appellants make two breach of contract claims, one for specific performance (count 1)

and one for damages (count 2). They also make one claim for damages for breach of the joint

work devised by Judge Leval in *Teachers Insurance & Annuity Association v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987). In *Tribune*, Judge Leval surveyed the doctrine on preliminary agreements, like the one in this case, noting that "[a] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." *Id.* at 497. Therefore, the judge concluded, "[m]ore is needed than agreement on each detail [to create a binding obligation. There must be] overall agreement … to enter into the binding contract." *Id.; see also Washington Heights–West Harlem–Inwood Mental Health Council, Inc. v. District 1199, Nat'l Union of Hosp. & Health Care Employees*, 748 F.2d 105, 107 (2d Cir.1984) (intent determines whether document constituted binding agreement); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.) (same), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968) (same), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

In *Tribune*, Judge Leval identified two types of preliminary agreements. In the first, the parties have reached complete agreement on all of the issues that require negotiation, but they have not yet completely formalized their agreement. In the second, the parties have committed themselves to some major terms, but some terms will remain to be negotiated—as is the case with the memorandum at issue here. "[T]he parties can bind themselves to a concededly incomplete agreement," Judge Leval said of this second type, "in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." 670 F.Supp. at 498; *see also Teachers Ins. & Annuity Ass'n v. Butler*, 626 F.Supp. 1229 (S.D.N.Y.1986) (after entering a binding agreement, party breached obligation to negotiate remaining

terms in good faith), *appeal dismissed*, 816 F.2d 670 (2d Cir.1987); *Goodstein Constr. Corp. v. City of New York*, 67 N.Y.2d 990, 494 N.E.2d 99, 502 N.Y.S.2d 994 (1986).

To determine whether a preliminary manifestation of assent was a binding preliminary agreement of the second type, Judge Leval used a modified version of a test that this court devised for preliminary agreements that more closely resemble the first type. 670 F.Supp. at 498–99; *see Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75–76 (2d Cir.1984). Judge Leval considered whether the intent to be bound was revealed by (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. 670 F.Supp. at 499–503. The first factor, the language of agreement, is the most important. *Id.* at 499; *cf. Winston*, 777 F.2d at 80 (if party expresses intent not to be bound until it achieves fully executed document, oral agreement will not result in binding contract); *R.G. Group*, 751 F.2d at 75 (considerable weight given to explicit statement that party will not be bound in absence of written agreement).

In applying the *Tribune* test to this case, we need look no further than the first factor. The language of the November memorandum—two references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date—shows that Arcadian did not intend to be bound. Contrast the language of the November memorandum with the letters in *Tribune* and *Butler*. In *Tribune*, a letter described itself as a "binding agreement," 670 F.Supp. at 494, and in *Butler*, the parties agreed that their agreement was binding, 626 F.Supp. at 1230. This fact was critical to Judge Leval's reasoning in *Tribune*:

venture contract (count 3), and one claim for consequential damages resulting from these alleged breaches (count 4), the damages being the result of API's entry into a five-year supply contract with OTP. In the fifth count, which alleges promissory estoppel, they seek performance and damages.

"[A] party that does not wish to be bound, he said, "can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.'" 670 F.Supp. at 499. Conversely, a party that *wishes* to be bound can very easily protect itself by refusing to accept language that shows an intent *not* to be bound. *See Reprosystem*, 727 F.2d at 262 (reference to future formal agreement shown intent not to be bound); *Chrysler Capital Corp. v. Southeast Hotel Properties Ltd. Partnership*, 697 F.Supp. 794, 800–01 (S.D.N.Y.1988) (letter which stated that it would not become a binding agreement until certain conditions were met showed intent not to be bound unconditionally). In order to prevail on the breach of contract claims, Arcadian needed to show only that API "should have known that [Arcadian] did not intend to be bound before the [final] contract was signed." *Reprosystem*, 727 F.2d at 261; *see also V'Soske*, 404 F.2d at 499 (same). The language of the November memorandum reveals just that: API should not have believed that Arcadian intended to be bound.

As Judge Leval noted in *Tribune*, "There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Id.* at 499. In *Tribune*, the language of the agreement argued persuasively for overcoming this presumption; here, the language of the agreement argues persuasively for letting the presumption stand. *See generally International Klafter Co. v. Continental Casualty Co.*, 869 F.2d 96, 99 (2d Cir.1989) (under New York law, court must give effect to parties' intent when it is clearly set forth in agreement).

■ Appellants argue that the question whether a contract exists is ill-suited for summary judgment. On the contrary: Where "a question of intention is determinable by written agreements, the question is one of the law, appropriately decided ... on a motion for summary judgment." *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291, 298

N.E.2d 96, 100, 344 N.Y.S.2d 925, 930 (1973); *see also Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 546 (2d Cir.1989) (factual question arises when intent cannot be determined from agreement); *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (summary judgment appropriate where contract is unambiguous). Since in this case intent can readily be determined by examining the November memorandum, summary judgment was perfectly appropriate even though there was considerable partial performance.

## B. *Promissory Estoppel*

■ Summary judgment was not appropriate, however, on appellants' promissory estoppel claim. In New York, promissory estoppel has three elements: "'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir.1986) (quoting *Restatement (Second) of Contracts* § 90 (1981)); *accord Reprosystem*, 727 F.2d at 264. Prevailing on a promissory estoppel claim, however, sometimes entitles a party only to its out-of-pocket expenses, rather than to benefit-of-the-bargain damages. *See, e.g., Esquire*, 804 F.2d at 794 (affirming jury award out-of-pocket expenses under New York law); *see also Restatement (Second) of Contracts* §§ 90 comment d, 349 comment b; *Palandjian v. Pahlavi*, 614 F.Supp. 1569, 1581–82 n. 1 (D.Mass.1985) (equity requires only out-of-pocket award), *appeal denied*, 782 F.2d 313 (1st Cir.1986); *cf. Nimrod Mktg. (Overseas) Ltd. v. Texas Energy Inv. Corp.*, 769 F.2d 1076, 1080 (5th Cir.1985) (losses from collateral supply contracts recoverable under promissory estoppel theory if breaching party had knowledge of special circumstances producing such damages) (Texas law), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1948, 90 L.Ed.2d 357 (1986); *R. Renaissance, Inc. v. Rohm & Haas Co.*, 674 F.Supp. 591, 595–96 (S.D.Ohio 1987) (recov-

ery for promissory estoppel claim cannot include lost profits) (Ohio law).[2]

Appellants' promissory estoppel claim is based on evidence that Arcadian knew and approved of API's expenditures and collateral contracts, but Arcadian suddenly demanded a majority interest in API when the phosphate fertilizer business became "dramatically" profitable.[3] When appellants rejected Arcadian's proposed modification of the latter's equity position, appellants say Arcadian called off negotiations—thereby violating its promise to bargain in good faith. Because appellants' allegations raise genuine issues of material fact as to whether Arcadian made a clear, unambiguous promise to negotiate in good faith, whether appellants reasonably and foreseeably relied on that promise in entering into expenditures and collateral contracts with suppliers or others, and whether appellants thereby sustained an injury, the district court erred in granting summary judgment on their promissory estoppel claim. Fed.R. Civ.P. 56(e).[4]

We therefore affirm as to appellants' breach of contract claims, but reverse and remand as to their promissory estoppel claim.

2. Out-of-pocket damages are particularly appropriate where, as may be the case here, the plaintiff cannot rationally calculate the benefit of the bargain. It is difficult to make this calculation rationally unless one can say that the defendant's failure to follow through on a promise is a but-for cause of the loss of profits. Here, Arcadian's alleged failure to bargain in good faith is not a but-for cause of API's lost profits, since even with the best faith on both sides the deal might not have been closed. Because attributing API's lost profits to Arcadian's bad faith may be speculative at best, the district court may decide that damages based on API's out-of-pocket costs are most appropriate.

3. API's conflicting version of the collapse of negotiations speaks of unresolved issues, lack of progress, and financing troubles.

4. The district court justified its decision by saying, "A claim for promissory estoppel under New York law must fall where the 'negotiations of the parties as reflected in the draft agreements made it clear that the obligations of both [were] contingent upon execution and delivery of formal contract documents.'" *Arcadian Phosphates, Inc.*, No. 87 Civ. 2353, memorandum endorsement at 2 (S.D.N.Y. Feb. 27, 1989) (quoting *Reprosystem*, 727 F.2d at 265). But the district court conflated Arcadian's substantive obligation with its obligation to bargain in good faith. Unlike Arcadian's substantive obligations, its obligation to bargain in good faith was obviously intended to begin immediately. The good-faith obligation cannot, therefore, be said to be contingent upon formal contract documents.