104 F.3d 350
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
In the Matter of the Application of NAP, INC., Petitioner-Appellant,
v.
For a Judgment Staying the Arbitration Commenced by FRAJAC,
S.A., Respondent-Appellee.
 No. 96-7677.
 United States Court of Appeals, Second Circuit.
 Sept. 20, 1996.
 
 Scott M. Berman, Kaye, Scholer, Fierman, Hays & Handler, LLP (N.Y.C) for Petitioner-Appellant:
 Arthur H. Aufses III, Kramer, Levin, Naftalis & Frankel (N.Y.C) for Respondent-Appellee:
 Before CALABRESI, PARKER Circuit Judges and POLLAK, Senior District Judge.*
 UPON CONSIDERATION of this appeal from a judgment of the United States District Court for the Southern District of New York (Stanton, J.), it is hereby
 ORDERED, ADJUDGED, AND DECREED that the judgment be and it hereby is AFFIRMED.
 NAP, Inc. appeals from a judgment denying its petition to stay arbitration and granting FRAJAC's cross-motion to compel arbitration entered on May 6, 1996, in the United States District Court for the Southern District of New York (Stanton, J.). NAP also moves to supplement the record on appeal.
 
 
 1
 Between June, 1994 and October 6, 1994, NAP and FRAJAC negotiated a relationship by which NAP would market and distribute garments made by FRAJAC. On October 6, 1994, FRAJAC and NAP signed a letter outlining the details of that relationship. FRAJAC claims that this letter is a binding contract, and NAP claims it is a non-binding letter of intent. From the fall of 1994 until the spring of 1995, NAP and FRAJAC substantially followed the terms of the letter. Disputes then arose, and on June 14, 1995, the head of NAP wrote a letter which sought to terminate the relationship between the companies.
 
 
 2
 After the termination letter by NAP, FRAJAC filed a demand for arbitration for an alleged breach of contract with the American Arbitration Association. NAP then petitioned the New York State Supreme Court, New York County to stay the arbitration. FRAJAC removed NAP's petition to the federal court on diversity grounds and cross-moved to compel arbitration. On April 30, 1996, the district court denied NAP's petition to stay arbitration and granted FRAJAC's cross-motion to compel arbitration in a Memorandum and Order. A final judgment was entered on May 6, 1996, and a month later, the district court denied a motion by NAP for reargument or for a stay of arbitration pending appeal. NAP filed a notice of appeal from both the denial of its petition for a permanent stay of arbitration and the grant of FRAJAC's cross-motion to compel arbitration. It also moved for a stay pending appeal or, alternatively, an expedited appeal. On June 18, 1996, we denied a stay and granted the motion for an expedited appeal.
 
 
 3
 NAP raises three grounds for challenging the district court judgment. We reject all of them.
 
 
 4
 1. No Agreement to Arbitrate. NAP argues that it never agreed to be subject to arbitration. The October 6, 1994 letter did provide for arbitration, and it set forth the intentions of the parties in great detail. But it also stated that "[t]he parties understand that a definitive Exclusive Distributorship and License Agreement (the "Agreement") shall be executed by the parties and the terms contained herein shall not be effective until the Agreement is fully executed." This sentence, NAP contends, expressly disavowed any intent to be bound by the letter. And, NAP maintains that Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69 (2d Cir.1989), requires this court to find that, given this disavowal, no enforceable rights were created by the letter or by the arbitration clause contained in it. FRAJAC, by contrast, argues that we should follow the district court and consider the aforementioned sentence as no more than one among a number of factors that, considered together, reveal that NAP and FRAJAC intended to be bound by the October 6 letter, and hence by its arbitration clause.
 
 
 5
 Although a formal contract is the standard method for parties to indicate their mutual consent to be bound, this circuit, in at least two circumstances, has held that informal contract negotiations may create legally enforceable rights. See Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491, 497-98 (1987). First, a binding contract may be created when parties agree on all material issues requiring negotiation, even though the parties expect to formalize the agreement in the future. See, e.g., R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir.1984); V'Soske v. Barwick, 404 F.2d 495, 499 (2d Cir.1968), cert. denied, Barwick v. V'Soske, 394 U.S. 921 (1969). Second, a binding commitment to negotiate in good faith towards a contract may be created by preliminary agreement on major terms, even though important terms of the ultimate contract remain open. See Arcadian Phosphates, 884 F.2d at 71-72 (adopting analysis of Teachers, 670 F.Supp. 491).
 
 
 6
 In the case before us, the October 6 letter agreed on all major terms with great particularity and clearly did not contemplate further negotiations. Nevertheless, to determine whether the informal agreement was binding, we must establish the intent of the parties as reflected in their words and deeds. In making this determination, we have emphasized four factors: statements of intent, open terms in the agreement, partial performance of the agreement, and the customary form for the type of arrangement. R.G. Group, 751 F.2d at 74-77; Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir.1986). "No single factor is decisive, but each provides significant guidance." R.G. Group, 751 F.2d at 75 (citations omitted). The language of the parties, however, is the most influential factor. See Arcadian, 884 F.2d at 72 (citations omitted).
 
 
 7
 Despite the importance of language, we agree with the district court that an analysis of the four factors leads to the conclusion that in this case the parties intended to be bound by the letter of October 6, 1994. Although the letter did state that its terms would not be effective until a formal agreement was executed, this language is not strong enough to counter other indicia of an intent to be bound. In the first place, there was other language in the letter that suggested that it was immediately binding. Thus, royalty payments were to be paid on the first day of each quarter "commencing from the date hereof," and NAP was to open a letter of credit for FRAJAC for $300,000 "immediately." Moreover, no material terms remained unresolved. And, there is no evidence that future negotiations on major terms were contemplated. Extensive performance by both parties also strongly indicated a binding commitment to the terms of the letter. This performance went beyond mere adherence to those terms. It bespoke an understanding by the parties that they were bound.
 
 
 8
 Finally, NAP's correspondence with FRAJAC equated the October 6 letter with the agreement contemplated in that letter. Thus, on December 21, 1994, a letter from NAP to FRAJAC referred to the October 6 letter as "the Agreement" and quoted it to resolve a dispute about royalty payments. This reference indicates either that the October 6 letter was originally meant to be "the Agreement" or that NAP and FRAJAC later contracted to treat the letter as the contemplated Agreement. Since it is conceded by the parties that, whatever the time the Agreement was made, its terms would run from October 6, the letter and all its clauses bound the parties from that date. The letter included an arbitration clause; it follows that the parties made an enforceable agreement to arbitrate their disputes.
 
 
 9
 2. Scope of Arbitration Provision. NAP's second claim is that even if the letter is enforceable, the arbitration clause does not apply to this dispute. By its terms the clause covers only disputes "arising out of the terms of the Agreement," and, NAP argues, the letter is not the agreement to which the clause referred. That agreement, NAP maintains, was the contemplated agreement that was never signed. We find this argument without merit. Since we have found that either the contemplated future agreement was intended to be no more than a formalization of the letter or that the parties subsequently contracted to treat the letter as "the Agreement," it would be strange to hold that references to the agreement in the arbitration clause were not functionally equivalent to references to the letter itself. For this reason, we hold that the scope of the arbitration clause encompassed the disputed issues in this case.
 
 
 10
 3. Finding of Undisputed Facts. NAP's third claim is that the district court erred in finding that the facts set out in a statement presented to the court by FRAJAC (the Igelman Declaration) were undisputed. NAP did inform the court that there were inaccuracies in the declaration, but only did so in a conclusory allegation in its memorandum in support of its petition to stay arbitration. To create an issue of fact, a party must make specific assertions and substantiate its claims with supporting evidence. See, e.g., Interbras Cayman Co. v. Orient Victory Shipping Co., 663 F.2d 4, 7 (2d Cir.1981). This, NAP has not done.
 
 
 11
 Because FRAJAC agreed at oral argument to withdraw the statement in its briefs that NAP claimed was a misrepresentation, we also reject NAP's arguments for supplementing the record.
 
 
 12
 We have examined all of NAP's contentions and found them to be without merit. The district court's judgment is affirmed, and the motion to supplement the record on appeal is denied.
 
 
 
 *
 The Honorable Louis H. Pollak, Senior District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation