HORPHAG RESEARCH
LIMITED, Plaintiff,

v.

HENKEL CORPORATION and Cognis
Corporation, Defendants.

Henkel Corporation and Cognis
Corporation, Counterclaim and
Third–Party Plaintiffs,

v.

Horphag Research Limited,
Counterclaim Defendant,

and

Charles Haimoff, Frank Assumma, and
Natural Health Science, L.L.C.,
Third–Party Defendants.

No. 00 Civ. 0438(MBM).

United States District Court,
S.D. New York.

Oct. 5, 2000.

Eduardo L. Tabio, Fox Horan & Camerini, New York City, for Plaintiff.

R. Scott Garley, Gibson, Del Deo, Dolan, Griffinger & Vecchione, New York City, Collins J. Seitz, Rudolf E. Hutz, Connolly Bove Lodge & Hutz, Wilmington, DE, for Defendants.

John J. Henry, Whiteman Osterman & Hanna, Albany, NY, for Third–Party Defendants.

OPINION AND ORDER

MUKASEY, District Judge.

Defendants Henkel Corporation and Cognis Corporation ("Henkel/Cognis") have moved for specific enforcement of what they allege is a written settlement agreement between them and plaintiff Horphag Corporation. Horphag manufactures Pycnogenol, a trademarked anti-aging nutritional supplement derived from the bark of French pine trees. Henkel/Cognis has distributed the product. The parties' underlying dispute arose when Horphag cancelled its distribution agreement with Henkel, and refused to provide product to Henkel's successor in interest, Cognis, based on Henkel's alleged failure to comply with certain minimum purchase requirements. The case was removed to this court in January 2000, from Supreme Court, New York County, based on diversity of the parties' citizenship. Soon afterward, the parties began the process of arbitrating their disputes before the American Arbitration Association ("AAA"). In June 2000, they met and sought to settle their differences, an attempt that gave rise to this motion. For the reasons set forth below, the motion for specific enforcement of the alleged settlement agreement is denied.

## I.

The writing that is alleged to embody the settlement accord in question—a letter written to Horphag by an executive of Cognis—recites agreements reached between the parties, "[s]ubject to the signing of a full and definitive settlement agreement (the 'Agreement')." (Hoevelmann Decl. Exh. A) The principal basis for the nascent settlement was Horphag's agreement to buy Cognis's inventory of Pycnogenol, and to pay for it in installments, the last of which would have been due September 30, 2000. (*Id.*) Apparently in aid of permitting Horphag to arrange to have funds available for the purchase, the letter required Henkel/Cognis to project its closing inventory of the product within five days of the letter, but the letter itself estimated the value of that inventory at "$15 to $16 million." (*Id.*)

Other agreements set forth in the letter include Cognis's undertaking to stop distribution of Pycnogenol as of July 1, 2000. (*Id.*) The letter solicited the written approval of Horphag, upon receipt of which "we will instruct our people in the U.S. to work out a definitive agreement." (*Id.*) That letter stated as well that the parties "will refrain from any communication to the market on the subject matter till the date of signing of the Agreement."

Henkel/Cognis cites also the covering letter from Horphag memorializing the return of a signed copy of the above-cited letter, in which Horphag's principal, Charles Haimoff, accepted "your outline of the agreement between Cognis and Horphag Research," and wrote that Horphag "will do its utmost to comply with our agreement in the short time available." (*Id.* Exh. B) Henkel/Cognis argues that, in reliance on the existence of a binding agreement, Cognis disclosed its inventory of Pycnogenol, and ceased distributing the product from approximately June 11 or 12, until the settlement fell apart on or about June 30, 2000, when Horphag notified Henkel/Cognis that it had been unable to secure financing to support the settlement. (*Id.* ¶ 19)

The record includes also correspondence from counsel for Henkel/Cognis to the AAA, notifying that forum on June 22 that "[t]he parties . . . are currently circulating a proposed settlement agreement," and stating that this court had "extended its time to issue a decision [on the parties' motions for preliminary relief] to July 12 in order to allow the parties to complete a settlement." (Tabio Decl. Exh. A)

On July 17, counsel for Henkel/Cognis notified the AAA that it was then "necessary to reactivate the arbitration proceedings" and that the court had "denied the parties' cross motions for preliminary injunctions." (*Id.* Exh. B) Counsel followed up that letter with one on July 20 to press urgency of the case, as follows: "Now that the District Court has denied the cross motions for preliminary injunctions, a prompt hearing is of utmost importance." (*Id.* Exh. C) Neither letter mentioned that a settlement had been reached.

It bears mention as well that the parties appeared in court on July 13, 2000, at which time I read into the record an opinion denying both sides' applications for preliminary injunctive relief. Neither party advised the court at that time, or at any time prior thereto, that a settlement had been concluded. It was not until a conference on August 3 that Henkel/Cognis disclosed to the court its assertion that Horphag had reneged on a concluded settlement.

## II.

■ The standard for determining whether a settlement has been reached may be derived from cases dealing generally with the issue of when parties in negotiation have reached a binding agreement. "In any given case it is the intent of the parties that will determine the time of contract formation." *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985). In *Winston,* a case in which parties to litigation exchanged drafts of settlement agreements but never signed the same document, the court listed the

following factors for a court to consider in determining whether the parties intended to be bound:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Id.*

A refinement of that standard may be found in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989), where the Court applied a framework devised by Judge Leval in *Teachers Ins. & Annuity Ass'n. v. Tribune Co.*, 670 F.Supp. 491, 498–99 (S.D.N.Y.1987). Judge Leval identified two kinds of preliminary agreements to which courts could find that parties intended to be bound. The first was one in which the parties had reached complete agreement on all issues that required negotiation, but had not yet formalized their agreement. The second was one in which they had reached agreement on major terms, but still had to negotiate others. In the latter case, the agreement on major terms could be found binding, with a binding obligation as well to negotiate the remaining terms in good faith. *See Arcadian Phosphates*, 884 F.2d at 72.

In addition to the standards and elements described above, it bears mention that when the parties are not only in negotiation but also in litigation, the litigation itself may present facts that should be considered in order to determine the parties' intent.

## III.

█ Henkel/Cognis contends that we are dealing in this case with the first kind of binding preliminary agreement—one covering all issues that required negotiation. Henkel/Cognis stresses also that it is the first factor listed in *Winston*—whether there is an express reservation of

the right not to be bound absent a final writing—that is the most important in determining whether parties intended to be bound to a preliminary agreement. *See Krauth v. Executive Telecard, Ltd.*, 890 F.Supp. 269, 293 (S.D.N.Y.1995) (citing *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir.1984)).

Here, there is no such express reservation. However, the letter on which Henkel/Cognis relies, which its own principals drafted, is notable for its omission of any language that suggests finality or a current willingness to be bound, and for its specific placement of the moment of contracting in the future. The letter sets forth agreements "[s]ubject to the signing of a full and definitive settlement agreement," and seeks the signature of Horphag's representative so that people in the United States could be instructed to "work out a definitive agreement." Moreover, one of the points agreed to, as described in the letter, was that the parties "will refrain from any communication to the market on the subject matter till the date of signing of the Agreement." (Hoevelmann Decl. Exh. A)

Thus, by Henkel/Cognis's own description, the terms set forth in its letter were neither "full" nor "definitive." Moreover, the parties' decision to withhold public announcement of an agreement until a final document had been signed bespeaks awareness and acknowledgment that it was still possible that a "full" and "definitive" agreement might not be reached.

The covering letter from Horphag's representative returning a signed copy of Henkel/Cognis's letter is not to the contrary. That letter refers to the signed enclosure simply as an "outline." Although it states Horphag's intent to "do its utmost to comply with our agreement in the short time available," that statement can be read simply as a commitment to seek financing to help put the agreement into effect, an effort no one denies that Horphag made.

Henkel/Cognis argues that it partially performed the agreement by disclosing its inventory to Horphag—presumably in an inventory projection called for in the letter, and by refraining from sales beginning on or about June 11 and continuing until on or about June 30. Henkel/Cognis suggests that its inventory projection was somehow to Horphag's benefit, and disclosed a trade secret. However, the letter itself belies that position. The only reason for the inventory projection was to permit Horphag to arrange to have funds available to purchase Henkel/Cognis's inventory. Even before Henkel/Cognis was aware that Horphag would sign and return the letter, it disclosed that its inventory was worth between $15 and $16 million. Any more precise disclosure, which in any event was only a projection, could not have advantaged Horphag in any perceptible way. Although Henkel/Cognis did cease sales of Pycnogenol for a brief time in June, such cessation could not have been part performance of the alleged agreement because, according to the letter, Henkel/Cognis was not called upon to cease distributing Pycnogenol until July 1. If Henkel/Cognis stopped distributing Pycnogenol before that, it did so either as a gesture of good will, or, considering that its entire inventory was to be purchased by Horphag, in furtherance of its own interest.

As to the third element, it appears from both the signed letter and the covering letter returned by Horphag that the signed letter did not contain all of the terms to be included in a settlement agreement.

Finally, although the disputed letter is a writing, the agreement in question, involving the settlement of a litigation, is usually in a form more precise and inclusive than the proffered letter, which does not even provide explicitly for termination of the litigation.

Again, examining the various factors listed above is intended to disclose the status of negotiations and when the parties intended to be bound. These parties were engaged in litigation, and events in that litigation also should be examined insofar as they may reflect that intent. The status of the negotiations as of the time Horphag signed the letter from Henkel/Cognis, and the parties' intent, may be discerned in the June 22 letter of Henkel/Cognis's attorney to the AAA. He wrote that the parties "are currently circulating a proposed settlement agreement," not that an agreement had been reached. (Tabio Decl. Exh. A) Moreover, as noted, Henkel/Cognis's counsel did not disclose to the court on July 13 that a settlement had been agreed upon and breached, and wrote again to the AAA on July 17 and July 20 without making that disclosure.

At most, it would appear that the parties had an agreement of the second type enumerated by Judge Leval—an agreement on major terms with others to be negotiated, and an obligation imposed on both parties to negotiate in good faith. It appears further that what brought these negotiations to grief was Horphag's inability to obtain financing. There is no claim that that barrier resulted from Horphag's bad faith, or that Horphag did not try to overcome it. It appears that Horphag did not complete the settlement because it became impossible to do so.

For the above reasons, Henkel/Cognis's motion for specific enforcement of a settlement herein is denied.

SO ORDERED.