IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2001 Session

**LAURENCE B. KANDEL, M.D.**
**v.**
**THE CENTER FOR UROLOGICAL TREATMENT AND RESEARCH,**
**P.C., RALPH C. BENSON, JR., M.D., L. DEAN KNOLL, M.D., and THE**
**INSTITUTE FOR UROLOGICAL RESEARCH**

**An Appeal from the Circuit Court for Davidson County**
**No. 98C-1987    Barbara N. Haynes, Judge**

---

**No. M2000-02128-COA-R3-CV - Filed April 17, 2002**

---

This is a breach of contract case. The plaintiff physician entered into an employment contract with the defendant physician's group. The contract provided that the physician would work for the group for one year, and that the parties would then "negotiate in good faith" to give the employee physician the opportunity to purchase stock in the group. At the end of the physician's first year of employment, the parties negotiated, but reached an impasse. Subsequently, negotiations ceased, and the physician's employment was terminated. He filed suit against the group, alleging that the defendants breached the contract to "negotiate in good faith," and that the defendants committed promissory fraud in inducing him into signing the employment agreement. The trial court granted summary judgment in favor of the defendants on both counts. The physician now appeals. We affirm. Even if Tennessee recognizes a cause of action for breach of an agreement to negotiate in good faith, the evidence does not demonstrate such a breach, and does not establish promissory fraud.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

HOLLY K. LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., and DAVID R. FARMER, J., joined.

Alfred H. Knight and William R. Willis, Willis & Knight, Nashville, Tennessee, for the appellant Laurence B. Kandel, M.D.

R. Dale Grimes, Bryan E. Larson, and Andrea Taylor McKellar, Bass, Berry & Sims, Nashville, Tennessee, for the appellees The Center for Urological Treatment and Research, P.C., Ralph C. Benson, Jr., M.D., L. Dean Knoll, M.D., and The Institute for Urological Research.

**OPINION**

This is a breach of contract case. In the spring of 1996, plaintiff/appellant Laurence B. Kandel, M.D. ("Dr. Kandel"), was engaged in the academic practice of urology in the state of New York. During that time, Dr. Kandel entered into negotiations with defendant/appellee Ralph Benson, M.D. ("Dr. Benson"), and defendant/appellee Dean Knoll, M.D. ("Dr. Knoll"), the sole shareholders in Defendant/Appellee The Center for Urological Treatment and Research, P.C. ("CUTR"), regarding Dr. Kandel joining CUTR as an employee in the practice of urology.

In July 1996, the parties executed a contract, effective as of September 15, 1996. The contract contained the following provision:

> 10. <u>Agreement to Negotiate in Good Faith Toward Purchase of Equity Ownership</u>. The Employer agrees that in the event Employee remains continuously employed by Employer for a period of one (1) year and has achieved Board Certification through the American Board of Urology, <u>Employer will negotiate in good faith with Employee to allow Employee to purchase from Employer that number of shares of Employer's stock which will permit Employee to own the same number of shares as the stockholder holding the most shares of Employer's stock at that time.</u> Employer anticipates that the purchase price of such stock shall be based on the GAAP book value of the Employer as of the date of the purchase.

(Emphasis added). Thus, the contract contained a provision requiring the parties to "negotiate in good faith" the sale to Dr. Kandel of an equal ownership share in CUTR at the expiration of one year.

Dr. Kandel remained Board certified, as required under his agreement, and completed his first year of practice at CUTR. Toward the end of his first year, Dr. Kandel raised to Drs. Benson and Knoll the issue of becoming a partner in CUTR pursuant to the terms of the contract. Dr. Kandel alleges that Drs. Benson and Knoll initially told him that he would have to wait another year before he became eligible to buy into the practice. When Dr. Kandel insisted that he had a contractual right to enter into good faith negotiations for the purchase of CUTR stock, the parties began to negotiate Dr. Kandel's buy-in.

Beginning in September 1997, CUTR made the first of several offers to Dr. Kandel. The parties agreed on many terms of the buy-in, such as the formula to be used in determining the amount of Dr. Kandel's compensation, the formula to be used to calculate the amount of Dr. Kandel's buy-in, and the terms of the covenant not to compete. Regarding the amount of Dr. Kandel's buy-in, the parties contemplated that Dr. Kandel would buy his stock for an amount equal to one-third of the group's net asset value (assets less liabilities). This would total approximately $141,000, based on a valuation of the group that included over $500,000 in accounts receivable. The parties disagreed, however, on the method for calculating the stock redemption value. CUTR

-2-

proposed that, upon termination of Dr. Kandel's employment, he would sell his stock to CUTR for its book value "provided that no value shall be assigned to accounts receivable." At the time of the negotiations, eliminating accounts receivable from the equation would have caused the book value of the stock to drop to an amount below zero. However, under CUTR's proposal, if Dr. Kandel were terminated he would have been entitled to a "severance pay" in an amount equal to 90% of the accounts receivable attributable to the services rendered by Dr. Kandel.

Dr. Kandel refused CUTR's proposal, asserting that it was not made in good faith because it required him to pay $141,000 for stock that would be essentially worthless if he were required to immediately redeem it. In response, CUTR defended its proposal to Dr. Kandel as it related to the stock redemption terms. In a letter to Dr. Kandel's attorney dated November 12, 1997, counsel for CUTR explained:

> [I]t is [ ] true that Dr. Kandel could be fired the day after he buys into CUTR. However, Dr. Benson's and Dr. Knoll's executed Employment and Redemption Agreements also contain similar "without cause" termination provisions that allow CUTR to terminate their employment without cause at any time without requirement of prior notice.

* * *

> However, [you] erroneously assume[ ] that Dr. Kandel would receive $0 if his employment with CUTR was terminated the day after he completed his buy-in or at any other time. To the contrary, Dr. Kandel would potentially receive two payments. First, Dr. Kandel, if terminated, is entitled to receive 90% of his accounts receivable . . . . This payment would result in a large payment to Dr. Kandel. Specifically, since Dr. Kandel's accounts receivable at the end of October approximated $93,000, Dr. Kandel would be entitled to a payment of approximately $84,000. It is important to note, however, that Dr. Kandel's current accounts receivable are significantly deflated solely because he took a considerable amount of time off during September. A more representative example may be Dr. Benson's accounts receivable as of October 31, 1997, which approximated $152,000. Under a similar provision in Dr. Benson's Employment and Redemption Agreement, Dr. Benson, if terminated, would be entitled to a payment of approximately $137,000, or 90% of his accounts receivable.

> Even though this payment may not equal or surpass Dr. Kandel's buy-in amount, it represents a fair price of admission to an established and highly regarded medical practice. It is also important to note that Dr. Kandel is not being asked to pay any amount for goodwill or name, which direct benefit he will receive immediately upon becoming a shareholder without any direct cost to him.

(Footnote omitted).

In a letter dated November 26, 1997, Dr. Kandel made a counter-proposal to CUTR, proposing, among other things, that the redemption value of his stock be determined according to the same formula utilized in the purchase of his stock. Significantly, Dr. Kandel's proposal sought to recover this stock redemption value *in addition to* the "severance pay" provision in CUTR's proposal. In a letter dated December 4, 1997, CUTR rejected that request, asserting that "[s]uch an unfair provision would allow Dr. Kandel to double dip into CUTR's accounts receivable" and would give Dr. Kandel rights greater than those held by the other stockholders, Dr. Benson and Dr. Knoll. The December 4 letter stated that it was CUTR's "final offer" to Dr. Kandel, and was set to expire on December 8, 1997. In response, Dr. Kandel argued that his proposal was fair in light of the fact that CUTR could terminate him without cause. Dr. Kandel also expressed regret that CUTR would not agree to give him a position on the group's board of directors, nor the right of first refusal to purchase the group in the event a third party offered to buy it. On December 8, 1997, because Dr. Kandel would not accept CUTR's "final offer," his employment was terminated.

On July 20, 1998, Dr. Kandel sued CUTR, Dr. Benson, Dr. Knoll, and The Institute for Urological Research ("IUR"), a non-profit corporation in which Drs. Benson and Knoll have an interest. In count one of the complaint, Dr. Kandel alleged that CUTR, Dr. Benson, and Dr. Knoll breached their contract to negotiate in good faith with Dr. Kandel to allow him to purchase stock in the group. In count two, Dr. Kandel alleged that CUTR breached its obligation under his employment contract to pay him certain bonuses described in the agreement. Finally, in count three, Dr. Kandel asserted a claim for promissory fraud alleging that the Defendants induced him into signing the employment contract by promising that he could become a shareholder in IUR at the end of his first year of employment. Dr. Kandel asserted that Drs. Benson and Knoll "knew said promises were false when they made them." Dr. Kandel sought compensatory damages including, but not limited to, lost salary, lost profits, lost bonuses, and the loss on the sale of his New York residence.

In response, the defendants filed a motion for summary judgment. On January 15, 1999, the trial court held a hearing on the motion. On February 4, 1999, the trial court granted summary judgment to the defendants on count one (breach of contract) and count three (promissory fraud) of the complaint, but denied summary judgment with respect to count two (employment bonus). On August 23, 2000, the trial court entered an order noting that the claim in count two had been settled and making the February 4 order final and appealable. Dr. Kandel now appeals the order entered on February 4, 1999.

Dr. Kandel argues on appeal that the trial court erred in granting summary judgment in favor of the defendants. He claims that a contract to "negotiate in good faith" is enforceable in Tennessee, and that the facts of this case would support a finding that the defendants breached their duty under his employment agreement to negotiate in good faith. Dr. Kandel further argues that the facts of this case would support his claim for damages under a theory of promissory estoppel.

We review the trial court's grant of summary judgment *de novo* with no presumption of correctness. **Warren v. Estate of Kirk**, 954 S.W.2d 722, 723 (Tenn. 1997) (quoting **Bain v. Wells**,

936 S.W.2d 618, 622 (Tenn. 1997)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.03. We must view the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. **Warren**, 954 S.W.2d at 723.

Dr. Kandel first argues that a contract to "negotiate in good faith," such as the provision in his employment contract, is enforceable in Tennessee.[1] He notes that, even where a contract does not contain a specific provision to that effect, every contract is subject to an implied covenant of reasonable and good faith performance. **See Covington v. Robinson**, 723 S.W.2d 643, 645-46 (Tenn. Ct. App. 1986) (concluding that the purchaser's refusal to perform in good faith constituted a default of their contractual obligations); **see also Safeco Ins. Co. of Am. v. City of White House**, 36 F.3d 540, 548 (6th Cir. 1994) (relying on the proposition that, according to Tennessee law, "standards of good faith and fair dealing [are] implied in every contract," quoting **Misco, Inc. v. United States Steel Corp.**, 784 F.2d 198, 203 (6th Cir. 1986)).

Dr. Kandel also cites two cases in which marital dissolution agreements requiring the parties to "negotiate in good faith" potential modifications relating to child support, alimony, and property allocation were enforced. **Bruce v. Bruce**, 801 S.W.2d 102, 103-04 (Tenn. Ct. App. 1990); **Threadgill v. Threadgill**, 740 S.W.2d 419, 424 (Tenn. Ct. App. 1987). In **Bruce**, the husband argued that the agreement to negotiate was an invalid "agreement to agree." This argument was rejected because the marital dissolution agreement "is not an agreement to agree in the future. A 'contract may provide for modification, and contracts which provide for subsequent changes therein are not unusual.' " **Bruce**, 801 S.W.2d at 106. In **Threadgill**, as in **Bruce**, the parties' duty to negotiate modifications in the original marital dissolution agreement arose if the parties experienced a change in circumstances warranting such a modification. The appellate court determined that the parties' circumstances had not changed so as to trigger any obligation to negotiate. **Threadgill**, 740 S.W.2d at 424. Consequently, the **Threadgill** court did not reach the issue of whether the provision to "negotiate in good faith" was enforceable.

CUTR argues that the current jurisprudence indicates an unwillingness to enforce an agreement to "negotiate in good faith."[2] In support, CUTR cites **EnGenius Entm't, Inc. v. Herenton**, 971 S.W.2d 12 (Tenn. Ct. App. 1997). In **EnGenius**, the plaintiff developer was selected by the defendants City of Memphis and Shelby County to develop leasehold space in The Pyramid, a public arena in downtown Memphis. The defendants' written Request for Proposals ("RFP") provided that, upon the selection of a developer, the specific rent structure would be negotiated between the parties. The defendants later demanded a $50,000 non-refundable fee from the

---

[1] The trial court's order did not indicate the basis for its dismissal of Dr. Kandel's claim. In light of the court's disposition of the matter, the parties both address the issue of enforceability on appeal.

[2] The arguments of CUTR apply to all defendants except where otherwise indicated.

developer for the right to negotiate a lease with the defendants. *EnGenius*, 971 S.W.2d at 15-16. The plaintiff developer refused to pay the fee, so the defendants terminated further negotiations and told the plaintiff that it would not be used as the contractor on the project. *Id.* The plaintiff developer filed a lawsuit alleging breach of contract, claiming, among other things, that the defendants breached their "obligation to deal with [plaintiff] fairly and in good faith to proceed with the development of the Leasehold Space of the Pyramid." *Id.* at 17.

The trial court dismissed the complaint. On appeal, the appellate court held that the RFP requiring the parties to negotiate was not an enforceable agreement. *Id.* at 17-18. The court reasoned that when parties agree to prepare and execute a final written agreement, "it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. . . . The so-called 'contract to make a contract' is not a contract at all." *Id.* (quoting 1 Arthur L. Corbin, et al., *Corbin on Contracts* § 2.8, at 133-34 (Rev. ed. 1993) (footnotes omitted)). Because the parties had not previously agreed on the essential terms of the rent structure, the court held that "no agreement existed between the parties regarding EnGenius's development and lease of The Pyramid space. . . . At most, the documents evinced *an agreement between the parties to negotiate in good faith to reach a final lease agreement.*" *Id.* at 18 (emphasis added).

The *EnGenius* court then cited cases holding that agreements to "negotiate in good faith" are enforceable under certain circumstances. *See*, for example, *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) (under New York law). In *Arcadian Phosphates*, the Second Circuit Court of Appeals, interpreting New York law, described two types of preliminary agreements. In the first type, the parties agree to later formalize a contract about which there has been complete agreement on all of the essential issues. In the second type, the parties have committed themselves to some of the major terms, but other essential terms remain to be negotiated. *Arcadian Phosphates*, 884 F.2d at 72. Under New York law, the existence of open terms in the second type of preliminary agreement is not fatal to its enforcement. *See Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). This is because the parties are bound to their ultimate contractual objective. *Id.* In the second type of preliminary agreement, the parties are bound "in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach a final agreement within the scope that has been settled in the preliminary agreement." *Id.*, *quoted in Arcadian Phosphates*, 884 F.2d at 72.

In the instant case, CUTR asserts that *EnGenius* stands for the proposition that an agreement to negotiate is enforceable only if it is the first type of preliminary agreement, i.e. only if the essential terms of the contemplated agreement have already been determined. Indeed, some courts adhere to this general rule. *See, e.g., Mohrenweiser v. Blomer*, 573 N.W.2d 704, 706-07 (Minn. Ct. App. 1998) (holding that an agreement to "negotiate in good faith," like a letter of intent and any other type of agreement to negotiate in the future, is unenforceable). Other courts conclude that such a provision is unenforceable because of the vagueness of such a contract. *See, e.g., Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (under Minnesota law, determining that a contract to negotiate is unenforceable because it is vague and uncertain as to the intent of the parties). Still other courts refuse to enforce a contract to "negotiate in good faith"

because of the difficulty in ascertaining an appropriate remedy for the breach of such a clause. ***See, e.g., Jenks v. Jenks***, 385 S.W.2d 370, 376 (Mo. Ct. App. 1964) (holding that "equity will not indulge the futility of ordering the parties to 'meet together' to 'discuss in good faith' the very problem on which they have demonstrated their inability to agree").

The instant case involves the second type of preliminary agreement, an agreement to "negotiate in good faith" where some essential terms are left to negotiation. The parties agreed that Dr. Kandel would be eligible to buy-in after one year of employment, that he would be entitled to purchase one third of the group's stock, and that the stock price would be determined according to the GAAP book value as of the date of purchase. However, the stock redemption value, among other items, had not been negotiated prior to the signing of the original employment agreement.

I n this case, we need not determine whether such a preliminary agreement would be enforceable under Tennessee law.[3] Even if Tennessee courts would recognize a cause of action based on such a provision, our review of the record indicates that no reasonable trier of fact could find that the defendants breached their duty under the circumstances.

Dr. Kandel maintains that the defendants breached their duty to bargain in good faith because they insisted on terms that were unreasonable on their face. "[A] party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside the scope of the parties' preliminary agreement." ***A/S Apothekernes Laboratorium v. I.M.C. Chemical Group, Inc.***, 873 F.2d 155,158 (7th Cir. 1989). In his pleadings, Dr. Kandel asserts that, although the defendants adopted minor terms that he requested, their "proposals always contained terms and conditions which allowed CUTR to terminate Dr. Kandel without cause at any time thereby causing him to forfeit more than $141,000 and thereby precluding him from competing with the Defendants in the middle-Tennessee area for one year." Thus, Dr. Kandel describes the "worst-case scenario," arguing that he could buy into the company for approximately $141,000, be fired without cause the very next day, be required to forfeit the $141,000 paid for his stock, and be prevented from practicing urology within a 50-mile radius for one year.

However, a number of significant factors are omitted from Dr. Kandel's analysis. First, under his own "worst-case scenario," though he would not receive compensation for his stock, he would be entitled to receive compensation under the "severance pay" provision of the agreement, which he acknowledges is a substantial amount. Second, under the terms proposed by CUTR, if Dr. Kandel remained with the group over any length of time, he would likely receive an amount for his stock in addition to the severance pay. In addition, although Dr. Kandel notes CUTR's proposed

---

[3]As we discussed above, Dr. Kandel cites authority indicating that the duty to bargain in good faith is implicit in all contracts under Tennessee law. The duty imposed by a contractual agreement to "negotiate in good faith," however, is distinguishable from the common-law duty to bargain in good faith. ***See Channel Home Centers v. Grossman***, 795 F. 2d 291, 299 n.8 (3d Cir. 1986); ***Venture Assocs. Corp. v. Zenith Data Sys. Corp.***, 887 F. Supp. 1014, 1017 (N.D. Ill. 1995). Thus, the authority on which Dr. Kandel relies does not support the position that Tennessee courts would enforce agreements to "negotiate in good faith."

contract would prevent him from competing with the defendants within a 50-mile radius for a period of one year from termination, that non-compete provision was actually negotiated by Dr. Kandel and included at his request.[4] Under Dr. Kandel's proposal, his stock redemption value would be calculated in the same manner as the stock purchase price. Under this proposal, Dr. Kandel would be entitled, upon termination, to receive his stock value ($141,000) *in addition to* the severance pay, which would result in a substantial windfall to Dr. Kandel. It must also be noted that the contract first proposed by CUTR to Dr. Kandel was essentially the same in all pertinent respects as the agreements signed by Drs. Benson and Knoll. Dr. Kandel requested several minor changes that were adopted by the defendants, including adding a provision for a specific level of salary, allowing Dr. Kandel a minimum of four weeks paid vacation, and allowing Dr. Kandel to participate in CUTR's employer-sponsored group insurance plans and any group-sponsored qualified retirement plan. Under these circumstances, we must conclude that no trier of fact could reasonably find that the defendants negotiated in bad faith. Thus, we affirm the trial court's grant of summary judgment in favor of the defendants on count one of the complaint.

Dr. Kandel next argues on appeal that the trial court erred in granting the defendants summary judgment on count three of his complaint, purportedly based on the theory of promissory estoppel. A "claim of promissory estoppel is not dependent upon the existence of an express contract between the parties." *EnGenius*, 971 S.W.2d at 19. Under that theory of recovery, a plaintiff can recover if, by the promises of another, he is induced into changing his situation. "This theory of recovery is sometimes referred to as 'detrimental reliance' because, in addition to showing that the defendant made a promise upon which the plaintiff reasonably relied, the plaintiff must show that this reliance resulted in detriment to the plaintiff." *Id.* at 19-20 (footnote omitted). Dr. Kandel argues that the defendants are liable to him under this theory because they made oral promises to him which induced him to move his family from New York to Tennessee and to incur substantial expenses related to his relocation.

In reviewing Dr. Kandel's complaint, however, he alleges that the defendants are liable to him on a theory of promissory fraud, rather than promissory estoppel. In count three of the complaint, Dr. Kandel asserts that the defendants induced him into signing the employment contract with CUTR by promising him that he could become a shareholder in IUR at the end of his first year of employment. Dr. Kandel states in his complaint that Drs. Benson and Knoll "knew said promises were false when they made them." In other words, Dr. Kandel asserts a claim for "fraud in the inducement."

The Tennessee Supreme Court "has not adopted the doctrine of promissory fraud in Tennessee, but has merely indicated a willingness to consider adopting the rule 'in a proper case where justice demands.'" *Farmers & Merchant's Bank v. Petty*, 664 S.W.2d 77, 80 (Tenn. Ct. App. 1983) (quoting *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978)). To

_____

[4]The non-compete agreement in Dr. Benson and Dr. Knoll's contracts, and the one proposed to Dr. Kandel, provides that the physicians cannot compete within three years from the time they purchase their stock.

establish a claim for promissory fraud, a claimant must show that, at the time the promise was made, the person making the promise had no intention to perform. *Fowler*, 575 S.W.2d at 499. The party alleging promissory fraud bears the burden of proving that the defendants who made the promise had no present intent to perform at the time the promise made. *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980). The Tennessee Supreme Court is unwilling to apply the doctrine "except in those cases where there is direct proof of a misrepresentation of actual present intention." *Farmers & Merchant's Bank*, 664 S.W.2d at 82.

In this case, the record contains no evidence to support Dr. Kandel's claim that the defendants fraudulently induced him into signing his employment agreement. There is no evidence to show that the defendants either made any misrepresentation with respect to IUR, or that any such misrepresentations were known to be false. In fact, the employment agreement signed by Dr. Kandel indicates that the parties would agree, after a year, to negotiate in good faith "to purchase from Employer that number of shares of Employer's stock which will permit Employee to own the same number of shares as the stockholder holding the most shares of Employer's stock at that time." Under the contract, "Employer" was CUTR, with no reference made to IUR. Therefore, the trial court did not err in granting summary judgment to the defendants on Dr. Kandel's claim for relief based on promissory fraud.

The decision of the trial court is affirmed. Costs are to be taxed to the appellant, Laurence B. Kandel, M.D., and his surety, for which execution may issue if necessary.

 

 

_____
HOLLY K. LILLARD, JUDGE